## HOTCHKISS v. NATIONAL CITY BANK OF NEW YORK.

### (District Court, S. D. New York. December 30, 1911.)

1. BANKRUPTCY (§ 166*)—PREFERENCES—ACTION TO RECOVER—INSOLVENCY—INTENT TO PREFER.

Under Bankr. Act July 1, 1898, c. 541, § 60, 30 Stat. 562 (U. S. Comp. St. 1901, p. 3445), providing that a transfer by an insolvent within four months preceding bankruptcy shall be deemed a preference, if it enables the creditor to obtain a greater percentage than others of his class, it is sufficient to avoid the transfer that the creditor had reasonable cause to believe that a preference was intended, without reference to the actual intent of the debtor.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 250–258; Dec. Dig. § 166.*]

2. BANKRUPTCY (§ 188*)—LIENS—CLEARANCE LOAN.

Where a stockbroker, doing business on the New York Stock Exchange, applied for and was granted a clearance loan by defendant, to be used according to the custom merely to release securities sold, so that they could be delivered and the proceeds collected, and the loan paid before the close of banking hours on the day it was made, the bank, passing the proceeds of the loan to the ordinary credit of the brokers and certifying checks against it, had no equitable or other lien therefor against the securities released by the proceeds of the loan, or on the proceeds of the securities when sold.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 270, 286–295; Dec. Dig. § 188.*]

3. LIENS (§ 1*)—WHAT CONSTITUTES—DEFINITION.

A "lien" is the right of the creditor to take his debt out of a specified res, which, though it may be a changing fund, must nevertheless be ascertained, since it is a property right, and could not be said to arise by a mere custom restricting a borrower's right to use the money loaned to release certain securities from a former pledge, nor by a promise to pay the creditor from a particular fund.

[Ed. Note.—For other cases, see Liens, Cent. Dig. §§ 1, 4, 23; Dec. Dig. § 1.*

For other definitions, see Words and Phrases, vol. 5, pp. 4144–4153; vol. 8, p. 7707.]

4. BANKRUPTCY (§ 188*)—LIENS—SECURITIES NOT IN POSSESSION—CLEARANCE LOANS.

Where notes executed by brokers to defendant bank as evidence of the receipt of a clearance loan, made in accordance with the custom of stockbrokers on the New York Stock Exchange for the purpose of shifting securities, only provided that the bank should have a lien on all property of the brokers then or thereafter "in its possession" or under its control.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

with the right at any time to demand additional security, such provision did not reserve a lien on the securities intended to be released by the proceeds of the clearance loan which were not in the bank's possession, but rather indicated an intent to the contrary.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 270, 286–295; Dec. Dig. § 188.*]

5. CONTRACTS (§ 1*)—DEFINITION.

A "contract" is an obligation attached by the mere force of law to certain acts of the parties, usually words, which ordinarily accompany and represent a known intent. The intention of the parties is to be determined by the meaning usually imposed by law on the words used, in the absence of mutual mistake, etc.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. § 1; Dec. Dig. § 1.*

For other definitions, see Words and Phrases, vol. 2, pp. 1513–1534; vol. 8, pp. 7615, 7616.]

6. BANKRUPTCY (§ 166*)—PREFERENCES—DELIVERY OF SECURITIES.

The bankrupts, who were stockbrokers, being largely indebted to defendant bank, but entirely solvent, on the morning of January 19th, obtained a clearance loan from defendant of $500,000, which under the custom of brokers was to be used solely for the shifting of securities and to be repaid before 3 o'clock on the same day. All but $117,000 was repaid, but about noon the brokers became insolvent because of the collapse of a stock pool in which they were heavily involved, and their suspension was announced on the Stock Exchange. The bank, with notice of their difficulties, but without knowledge that they were insolvent, sent its vice president and assistant cashier to the bankrupts' office, where they obtained additional securities, substantially all of which had been paid for or liberated by the use of the proceeds of the clearance loan. *Held*, that the transfer of such securities constituted a preference, recoverable by the brokers' trustee in bankruptcy.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 250–258; Dec. Dig. § 166.*]

7. BANKRUPTCY (§ 140*)—LOAN TO BANKRUPT—TRUST IN PROCEEDS OF LOAN.

Where a bank made a clearance loan to the bankrupts, applicable only to use in shifting securities, and to be paid during banking hours on the same day according to the custom of stockbrokers doing business on the New York Stock Exchange, the transaction did not create a trust of the funds while in the hands of the brokers, in the absence of an agreement to that effect.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 198, 199, 219, 221, 225; Dec. Dig. § 140.*]

8. BANKRUPTCY (155*)—EQUITIES OF THIRD PERSONS—RIGHT TO SUBROGATION.

The right to subrogation does not exist, unless the money used to pay the claim kept alive by subrogation was money on which the subrogated party had in equity some claim, charge, or lien, so that, where a bank loaned money to a broker to release securities, and the money loaned was in every sense the money of the broker, the bank was not entitled to subrogation to the rights of the creditor holding the securities, who was paid by the proceeds of the loan.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 155.*]

9. EQUITY (§ 407*)—HEARING BEFORE MASTER—REPORT—REFUSAL TO REQUEST.

Where requests to find are presented to a master, and refused, it is improper for the master to incorporate such requests in his report.

[Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 893–900, 903; Dec. Dig. § 407.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep't Indexes

**10.** ELECTION OF REMEDIES (§ 14*)—ACTION TO RECOVER—SECURITIES—CONVERSION.

Where a trustee in bankruptcy sued to recover certain securities received by defendant bank from the bankrupt, on the theory that their receipt constituted a preference, he was limited to such remedy, and could not affirm the transfer and sue for conversion.

[Ed. Note.—For other cases, see Election of Remedies, Cent. Dig. § 16; Dec. Dig. § 14.*]

Suit by Henry D. Hotchkiss, as trustee in bankruptcy of Henry S. Haskins, Henry Leverich, individually, and Fannie G. Lathrop, special partner, and as copartners trading as Lathrop, Haskins & Co., against the National City Bank of New York, to recover certain securities claimed by the bank to have been pledged for certain clearance loans made by the bank to the bankrupts, who were stockbrokers doing business on the New York Stock Exchange. Decree for complainant.

See, also, 200 Fed. 299.

Pursuant to the custom of stockbrokers in New York, securities are deliverable on the day following their sale. The transactions are of such magnitude that it would not be possible to conduct the business with the capital of the broker, who is obliged to obtain temporary credit to pay for securities deliverable to him, while he is receiving the proceeds of the securities which he is delivering to his purchasers. He is also required to carry large accounts of securities on margin for customers, to do which he obtains ordinary demand loans covered by securities, which are constantly changing by reason of sale or otherwise, so that, in addition to a temporary loan to make clearances, the broker must have accommodation to enable him to shift his collateral and receive securities, which are included in his ordinary demand loans. The clearance loans are loans for the day, which extend an accommodation credit in the morning for the specific purpose of enabling the broker to pay for securities delivered and to be returned from the proceeds of the same securities when delivered to his customer; it being understood that no portion of the proceeds of such loans should be used for any other purpose whatever to clear securities. No interest is charged on these loans, they being solely for the temporary accommodation of the depositor while he is meeting his engagements for the day. Though the loans are nominally made payable on demand, they are paid during the day as a matter of course without demand; the broker beginning to make deposits of proceeds with the bank which has given him the credit as soon as he begins to make deliveries, and that was the course of dealing between the bankrupts and the bank, which had been carried on daily for many years.

At the opening of business on January 19, 1910, the bankrupts were solvent and obtained a clearance loan from defendant bank of $500,000, evidenced by two demand notes, providing that the bank should have a lien on all property of the bankrupts then or thereafter in its possession or under its control, with the right at any time to demand additional security. Against such credit the bankrupts drew four checks to pay off outstanding secured loans to certain banks and trust companies, which checks were certified by the bank, and on payment of the loans the securities deposited as collateral therefor were delivered to the bankrupts. This clearance loan had been paid off in the usual course of business during the forenoon of the day it was made, with the exception of about $117,000, when the suspension of the bankrupts was announced on the Stock Exchange at about noon, resulting from a violent break in the stock market affecting all securities, but chiefly the stock of the Columbus & Hocking Coal & Iron Company, in which the bankrupts were largely interested, and in which a pool existed. At about noon defendant's vice president and assistant cashier, who had charge of making clearance loans, went to the office of defendant and asked for pay-

ment, or for securities to make good the clearance loan made that day, and after waiting an hour or two, during which the bankrupts conferred with their counsel, received securities not later than 2:30 p. m. When the bank received the securities, it knew that the bankrupts had suspended on the Stock Exchange, but did not know that it was insolvent. Substantially all the securities thus received were paid for or liberated from loans by the use of the proceeds of the clearance loan during the morning.

The special master found that when the securities were delivered the firm was insolvent, and that the representatives of the bank had reasonable cause to believe that it was intended to give defendant a preference whereby it would obtain a greater percentage of its debt than other creditors of the same class, and advised a decree for complainant, to which defendant objected.

R. P. Lewis, of Pittsburgh, Pa., for complainant.

John A. Garver, of New York City, for defendant.

HAND, District Judge. I do not think it necessary to add anything to the referee's report, except upon two questions: First, the need of proving that the defendant knew that the bankrupts intended a preference; second, the defense of an equitable lien.

[1] Upon the first point Alexander v. Redmond, 180 Fed. 92, 103 C. C. A. 446, is conclusive. It is idle to say that the opinion is obiter. I tried the case below, and, being of different opinion, decided it expressly, because the element of an intent to prefer was lacking. The reversal was therefore expressly upon that point, and the case settles the law in this circuit.

The second point is without doubt difficult, and requires careful analysis into the difference of intention between an obligation and a property right, which closely approach each other under these circumstances. I shall assume two things, which are at least not conceded. First, I assume that the written contracts may be varied by proof of a custom; second, that the custom would be valid, if it existed and actually gave a lien upon the assets. What, then, is the defendant's position? It is this: Under the custom of banks and brokers, first, the certified checks, when withdrawn from the bank, remain in equity still the bank's property, call the right a trust or whatever you will; second, the broker may use them only to relieve securities, either pledged or purchased, from liens upon them for money lent, or for purchase price due; third, the securities, when the broker receives them, are subject to an equitable lien equal in amount to the bank's advances upon them, and that lien remains, not only upon them, but upon any money or other property which the broker may get by pledging or by selling them, so that if the broker, having sold the released securities, reinvests the moneys, the lien would remain upon the new securities so purchased. In other words, the actual intention of the parties here effects, the defendant says, what the law would itself impose, if the funds were at any time in the hands of the broker affected with an equitable lien or an implied or constructive trust. Now, this is a perfectly intelligible position, whether or not it be a sound one, and I must concede to the defendant that it does not seem to me to be an answer merely to show that the broker is free to pledge or sell the securities pledged with the bank's money, because

if the custom contemplated his doing so, and also contemplated that the proceeds of such a sale or pledge should themselves be subject to the same lien, then it would not be an objection to show that the broker could in fact sell the securities.

[2] On the other hand, all that actually takes place is consistent with the absence of any lien whatever, and with merely a restriction upon the use of the checks to the release of securities, and a strict requirement that the loan be paid at the close of the day. Nothing which the brokers do indicates that they regard the property in their hands as subjected to any lien, because it is not enough that they are restricted in the use of the funds. For example, A. may lend B. money only on condition that B. put it in his business. A. would have no lien. Even if B. were to promise A. to pay him out of the funds in his business, A. would have no lien. Dillon v. Barnard, 21 Wall. 430, 22 L. Ed. 673; Franklin v. Browning. 117 Fed. 226, 54 C. C. A. 258; Barrington v. Evans, 3 Y. and C. 384. Justice Clifford says in Dillon v. Barnard, on page 439 of 21 Wall. (22 L. Ed. 673), that there must be—

"some act of appropriation on the part of the employer" (the promisor) "depriving himself of the control of the funds, and conferring upon the contractor" (the promisee) "the right to have them applied to his payment when the services are rendered or the materials are furnished. There must be a relinquishment by the employer of his right of dominion over the funds, so that without his aid or consent the contractor can enforce their application to his payment when his contract is completed. Nothing in the practice of the parties justifies any such inference as that indicated."

[3] A lien means that the lienor is to have the right to take his debt out of some specified res, which may, it is true, be a changing fund, but nevertheless must be ascertainable since it is a property right. To take out one's debt from a res is a very much more stringent right than to restrict the borrower's rights in the money you lend him, or even to promise to pay him from a fund. It seems hardly necessary to elaborate so obvious a distinction. Walker v. Brown, 165 U. S. 654, 17 Sup. Ct. 453, 41 L. Ed. 865. Again, the necessity of paying back the loan by 3 o'clock does not indicate that the bank meanwhile has any lien upon the funds, especially as the sources of payment are, naturally enough, indifferent to the bank itself. Nor is it significant that the bank should be interested in the kind of security in which the broker deals, because the loan represents so large a part of the broker's indebtedness that its proceeds will for the time being be the greater part of his assets. Further, the need of beginning to pay back the loan by 12 o'clock shows nothing, though the evidence really shows that the brokers have till 3 to begin to pay, because a creditor is under such circumstances naturally prone to suspicion if the debtor remains longer than necessary with so large a load of indebtedness. Indeed, the belief of a lien upon the broker's assets would rather tend to less close scrutiny of the time of his repayments.

While, therefore, the use of funds by the broker does not necessarily preclude the existence of a lien, there is nothing in the practice of business which at all requires it to be interpreted in such terms. It is quite true that these "clearance" loans are merely to enable bro-

kers to shift about securities; but, while they are shifting them, they may hold them free and clear, or they may hold them subject to liens for the price. No one can a priori say which is more likely, and in the absence of some express provision covering the case the only interpretation which can be safely made is from the practice. Furthermore, the only occasion in practice which would throw any light would be when the question arose as to the bank's rights between the time when the checks were certified and the loan paid. Such an occasion never arises, and so the custom does not help. If there had been instances in which the bank exercised a right as lienor during that period, and the broker assented, they would be material, but there are none. Even the single case which Alexander remembers in which the broker gave security overnight proves nothing, because the necessity would have been the same, whether or not the "clearance" loan had been secured by a lien, because the "clearance" loan was due in any case, and the broker must pay it by taking out a call loan with collateral somewhere, whether or not it had been secured itself theretofore.

All the evidence of custom, therefore, seems to me not to help the defendant in the least; on the other hand, some of it seems to injure its cause. For instance, if the brokers kept the "clearance" loan securities separate, or in any way distinguished the bank's supposed property from their own, there might be color for the claim of a lien; but, unfortunately for the bank, they mix everything indiscriminately. Now it is still possible that the lien is to be regarded as existing, even when for motives of convenience it is not kept defined; but upon the balance of probabilities the absence of any distinction must weigh. It would also be some evidence of intent if the "clearance" funds were not mingled with other funds in one deposit confessedly within the broker's power to use as he wishes; but they are so mingled.

[4] Again, a strong evidence of the intention of the bank is that they so expressly, and with exuberant verbiage, reserve liens upon all securities in their possession. "Expressio unius exclusio alterius." Contrast the note used by the Bank of Commerce, which reserved a lien upon all the securities while in the hands of the brokers which were purchased out of the proceeds of loan. Of course, neither of these notes is conclusive, but each indicates that when the banks intended such an agreement they knew how to express it, and that in the case at bar the defendant expressed quite clearly a lien depending upon possession. The most reasonable understanding of the relation between the parties is that the bank relied upon the good faith of the broker to pay his loan and not to use his funds improperly, but that it had occurred to no one to consider what was the position of the bank, if the brokers should fail before the loan was paid. If that occurred, it seems to me incredible that, with no practice to go by, they should have left the matter without definition. The forms of the relation are all those of debtor and creditor. The practice under it sheds no light, as I have said; for obviously the banks could not exercise the rights of a lienor until there was some occasion to assert a preference. It seems pretty clear to me that the present as-

sertion is no more than a favorable interpretation, which has no foundation in usage or expression. The bank itself, when asserting the lien, made no attempt to get only such securities as its funds had released, but gathered up all that came handy, among them stocks which had never been released by its funds, or by the substitution of securities released by such funds. It is impossible to see how, from any point of view, such securities were subject to a lien. The point is important only as showing that in practice the bank simply laid its hands on what it could get, like any other creditor seeking an illegal preference, and that its supposed lien must have been at the time ambulatory over the whole assets of the bankrupt estate. Such a practical construction of the bank's rights is of substantial importance, when the question is of the interpretation of a practice or custom.

The testimony of Carse goes a little further than the actual practice of the brokers and the bank. He in one place characterizes the relations between the two, and states what they understood the legal status to be. Thus he says on his direct examination:

"It has developed a form of trust, and the clear understanding implied between the broker and the bank is that whatever the broker obtains by the proceeds of the loan given to him is held in trust for the account of the bank. * * * If a broker pays for stocks or bonds, it is the understanding of the bank that they belong to them as collateral to their loan, and the broker simply retains possession of them long enough to make delivery and get payment," etc.

Now, if this witness' interpretation of the legal effect of the custom is to stand for the court's, of course the master's decision as to the meaning of the custom is wrong; for then it is an out and out trust, disappearing into an equitable lien, upon payment of the certified checks to another bank and receipt of securities in exchange. But such an interpretation is not competent evidence at all, since it in effect usurps the court's function which is to decide what was the "clear understanding."

[5] Moreover, it is of no consequence for another and deeper reason: A contract has, strictly speaking, nothing to do with the personal, or individual, intent of the parties. A contract is an obligation attached by the mere force of law to certain acts of the parties, usually words, which ordinarily accompany and represent a known intent. If, however, it were proved by twenty bishops that either party, when he used the words, intended something else than the usual meaning which the law imposes upon them, he would still be held, unless there were some mutual mistake, or something else of the sort. Of course, if it appear by other words, or acts, of the parties, that they attribute a peculiar meaning to such words as they use in the contract, that meaning will prevail, but only by virtue of the other words, and not because of their unexpressed intent.

[6] Now, in the case at bar, whatever was the understanding in fact of the banks, and of the brokers, too, for that matter, of the legal effect of this practice between them, it is of not the slightest consequence, unless it took form in some acts or words, which, being

reasonably interpreted, would have such meaning to ordinary men. Of course, it will be likely that, if they both do understand their acts in the same way, usual men would have done so, too. Yet the question always remains for the court to interpret the reasonable meaning to the acts of the parties, by word or deed, and no characterization of its effect by either party thereafter, however truthful, is material. The rights and obligations depend upon the law alone.

[7] When, therefore, Carse says what is the clear understanding of the legal effect of the practice, it is of no consequence, since that understanding was expressed only in acts, the natural meaning of which does not imply any trust relation, as he, and perhaps they, may have supposed. Had they said that they meant to create a trust, such a trust would arise; but when they merely adopted a course of conduct, the supposed results of that conduct are immaterial. I have therefore wholly disregarded this portion of Carse's testimony.

[8] The question of subrogation is easily disposed of. There is no subrogation, unless the money used to pay the claim kept alive by subrogation was money on which the party subrogated had in equity some claim, charge, or lien. I think there are no cases in which the payment of money in discharge of a claim allows of subrogation when the money was in all senses that of the man who paid the obligation. In other words, if the bank had some kind of equitable lien on the checks in the hands of the broker, it would certainly be entitled to be subrogated, but not if those funds were the funds of the broker in every sense. It is, of course, true that in Hurley v. Atchison, Topeka & Santa Fé Railroad, 213 U. S. 126, 29 Sup. Ct. 466, 53 L. Ed. 729, the court went a long way to sustain the equity of a claimant in bankruptcy, but I think it quite clear that the reason was this: The money which the road paid in advance for coal was the purchase price of an agreed quantity of coal, actually in existence. It was meant to give the road the right to demand from the seller a certain amount of coal actually in its possession, which, though not yet set apart from the bulk, was still definable in quantity. That was a specific interest in a res which survived bankruptcy. It hardly seems worth while to consider Sexton v. Kessler, 172 Fed. 535, 97 C. C. A. 161, in which there was a specific agreement.

[9] This case was heard in a somewhat anomalous way, as it was referred to take the testimony and report. The master has reported, and this is, therefore, in the nature of a final hearing on the testimony. The learned master allowed himself to be persuaded to incorporate certain refusals of requests to find—a practice which has, as far as I can learn, no place in equity practice, and the very beginnings of which I hope will always be resisted by the federal courts, which may otherwise find themselves in the unhappy predicament in that respect of the state courts under the New York Code. I have wholly disregarded these findings and refusals to find. I have treated the testimony as though submitted on final hearings.

[10] This suit is in equity to recover the actual securities in specie. That is the prayer, and that was what was intended. It is quite likely that the trustee may have had the right to sue at law after rescinding

the transfer and making a demand, because the refusal would have been a conversion. However, he did nothing of the kind, but proceeded in equity to reclaim the securities, and he cannot now blow hot and cold. The decree will be for the delivery of the securities, with any dividends received upon them. If the complainant wishes, he may take a reference on an accounting as to the responsibility for the depreciation in value. I cannot decide such a matter upon affidavits, though from the letters it looks as though the parties had substantially agreed that the bank should exercise its good judgment as to the sale of the securities. If so, the bank would under no circumstances be responsible for depreciation. If the trustee did not so consent, the question would arise whether or not the bank was a trustee ex maleficio, and, if so, whether it was responsible for any loss by depreciation, regardless of whether it used due care. Those questions I will not consider until it appears whether the trustee did not assent to the bank's course.

The trustee will, of course, recover costs. Should a reference be had, I should be glad to have Judge Brown again act as master, if he is willing.