## ROACH v. MATANUSKA VALLEY FARMERS COOPERATING ASSN.

### No. A–5315.

United States District Court, Alaska.
Third Division.

Dec. 30, 1949.

642

Bailey E. Bell, Anchorage, Alaska, for plaintiff.

Davis & Renfrew, Anchorage, Alaska, for defendant.

DIMOND, District Judge.

The plaintiff, as guardian of Arno Liebscher, an insane person, has brought this suit against the Matanuska Valley Farmers Cooperating Association, a corporation, praying for general equitable relief with respect to a lease covering all of the property of the ward, situated in the City of Anchorage, Alaska, made by the former guardian of the person and estate of the ward, James R. Campbell, now deceased. Equitable relief is asked upon several grounds, among them the following:

(1) That the lease is absolutely void because it was executed on February 27, 1941, to run for a term of 15 years thereafter, and the then guardian was without power to execute a lease for such a long period of time, which may extend beyond the life of the ward; (2) that the lease, if not absolutely void, is voidable because the then guardian, James R. Campbell, was ill and mentally incompetent to transact business and was overpersuaded and "overreached" by the defendant in the making of the lease; (3) that the lease has become oppressive to the point of being confiscatory; and (4) that the lease is now forfeited and is null and void by its express provisions because of the failure of defendant to pay an installment of the rent on or before the due date thereof, and because the defendant failed to keep the buildings on the premises adequately insured.

The relevant facts are that Arno Liebscher, the ward, was adjudged insane on June 28, 1929, in the Probate Court for the Territory of Alaska, Third Division, Anchorage Precinct, and was thereupon committed as an insane person to Morningside Hospital at Portland, in the State of Oregon, where he has since been confined. No suggestion is made that he will ever again become sane. On January 6, 1930, James R. Campbell, a resident of Anchorage, Alaska, was appointed guardian of the person and estate of Arno Liebscher, and duly qualified as guardian and continued to act in that capacity thereafter until August 25, 1941. At the time of the appointment of James R. Campbell, the entire estate of the ward consisted of a town lot in the City of Anchorage, Lot 9 in Block 23, with buildings thereon and a small amount of personal property. Shortly after the appointment of James R. Campbell as guardian, the property belonging to the ward was appraised by three appraisers appointed by the Court who as-

signed the value of $900 to the lot with buildings and improvements thereon, and $100 to the personal property consisting of furniture and fixtures in the buildings, making the total value of the estate of the ward, as appraised at that time, $1,000.00. No argument has been advanced to the effect that the appraisal was erroneous or that the property in the early months of 1930 was worth more than the value given to it by the Court's appraisers.

On August 25, 1941, the guardian, James R. Campbell, submitted to the Probate Court his final account of such guardian, that being the only report ever made by him. In this report, he states that during the period of guardianship he received the sum of $2,199.00 as rentals for said property, covering the entire period of the guardianship from January 6, 1930, until August 25, 1941. The guardian's report indicates that during the entire period of his guardianship prior to December, 1940, he had received, on the average, less than $15.00 per month in rentals from the property. Again it is undisputed that the final report of James R. Campbell, as guardian, is correct in all respects.

Testimony given during the trial indicates that during the 1930's, the City of Anchorage was in low economic condition, with many buildings vacant. After the outbreak of the Second World War, conditions radically changed so that at the present time, every building is occupied and the shortage of housing both for business purposes and for residences is acute, and rentals, except as controlled by law, have advanced accordingly—some say fantastically. From the proof it appears that James R. Campbell, as guardian, had difficulty at times in renting the buildings on the property at any price and that on occasion, when the buildings were rented, the tenants failed to pay the rentals agreed upon.

In December 1940, the defendant sought quarters for its business in the City of Anchorage and finally negotiated a lease of the property in question from James R. Campbell as guardian, at a monthly rental of $45.00 per month, for a term of ten years. In taking a lease of the premises it was contemplated by the defendant that additional buildings might be constructed on the lot and in the lease, which is dated December 6, 1940, provision was made that the defendant might erect thereon an entirely new building or buildings and that *"any improvement of a permanent nature or any structures erected on said property shall become a part thereof and the property of the first party"*. (Emphasis supplied.)

From the testimony of L. D. Roach, the present guardian, it appears that the then guardian, James R. Campbell, requested him to write the lease mentioned and to follow a form which had been drafted by or on behalf of the defendant. Mr. Roach testified that he protested against the lack of provision in the lease concerning payment of taxes on the property but that Mr. Campbell insisted upon having the lease drawn in the form prescribed. Mr. Roach, although an able and experienced lawyer, testified that he did not consider himself to act as counsel for Mr. Campbell in this matter. The testimony shows that some slight changes were made in the draft of lease furnished by Mr. Campbell in that the words "heirs, executors and administrators", when referring to the defendant, were omitted, but that generally, the lease of December 6, 1940, is almost a verbatim copy of the draft of lease furnished by defendant to Mr. Campbell and by the latter to Mr. Roach.

Shortly after the lease of December 6, 1940 was executed, the defendant discovered that the cost of construction was such as to require a lease for a longer term and so a new lease was written and executed. This lease is dated February 27, 1941, runs for the term of 15 years thereafter, with rentals payable on or before the 10th day of each month in advance, and is the one here in dispute. Although it is generally similar to the lease of December 6, 1940, it is markedly different in some respects. In the lease of February 27, 1941, the defendant was granted the right to tear down and remove the buildings on the premises and to construct a new building thereon to cost "not less than $15,000.00". That lease also con-

tained the following provision of genuine consequence here: *"and the said building so constructed shall be and become the property of the first party at the expiration of this lease"*. (Emphasis supplied.)

It is to be noted that the phrase last above quoted from the lease of February 27, 1941, does not appear in the earlier lease of December 6, 1940. The evidence indicates that the lease of February 27, 1941, was completely composed and drafted and written by counsel for the lessee, the defendant in this action. Each of the leases was expressly approved by order of the Probate Court.

On August 25, 1941, the date of filing his final account, James R. Campbell was discharged as guardian, and the present guardian L. D. Roach, was appointed and qualified and has since acted as such guardian.

Subsequent to February 27, 1941, all payments of rentals made by the lessee were made by the check of the lessee on a local bank. It appears that these checks were accepted without question until sometime in 1947, when the plaintiff held the checks at various times for several months before cashing them, evidently upon the theory that the checks themselves were not a lawful tender of the rent.

It further appears from undisputed evidence that on three occasions the checks themselves were not tendered until after the due dates of the monthly rentals specified in the lease. The rental for December, 1945, was paid by check dated December 28, 1945. The rental for January, 1947, was paid by check dated January 13, 1947, and tender by check was made on December 27, 1948, for the rent for that month. The plaintiff refused to accept as lawful tender of rents the check dated December 27, 1948 for payment of the rental of December 1948, and all subsequent checks. The check for the payment of the rental for January, 1949, is dated January 3, 1949. The plaintiff refused to accept that as payment of rental and both that check and the one dated December 27, 1948 were returned to the defendant. Since that time the defendant has deposited in Court the amount of all rentals due so that the full amount of rentals is now available to the plaintiff if he chooses or is required to accept it.

The municipal taxes assessed against the property, both buildings and land in recent years have become, in a sense, truly confiscatory so far as concerns the interest of the ward, if the estate of the ward is required to pay all of such taxes. It appears that in the fall of 1949, the total taxes upon both land and buildings, unpaid and in default after January 15, 1949, with penalty interest and costs, amounted to $943.60, and that notice has been given to the effect that on December 23, 1949, the City of Anchorage will for that reason ask the Court for an order for sale of said property, and other like property, upon which taxes are unpaid and in default. At the present time, the plaintiff does not possess sufficient money of the estate to make payment. The proof further shows that in the fall of 1946, the buildings on the premises were given a total assessed value of $15,114.00 and the land assessed at $18,000.00, making a total assessed valuation of $33,114.00 for both land and buildings; that as a basis of taxation, the City made calculation upon 90% of the value of both lands and buildings. In the fall of 1947, the City Council by resolution, decided that the assessed value of all buildings inside the City would be increased by 25% over the value placed thereon in 1946, which was done, so that in the fall of 1947 and at all times thereafter, the buildings on the premises have been assessed at $18,892.00 and the land at $18,000.00 making in round numbers a total valuation of both land and buildings of $36,000.00. The rate of taxation in 1946 was 15 mills; in 1947, 20 mills; 1948, 20 mills; in 1949, 20 mills; and 1950, 21 mills, on each dollar of the assessed value of taxable property within the City. The rates mentioned are those having relation to taxes falling due on January 1st of each of the years mentioned. All taxes on both land and buildings falling due on January 1, 1949, were paid by the defendant to prevent tax sale of the property. Remembering that the total income of the plaintiff derived as rentals from the property is $540.00 per year, it

can be seen that the total rentals cannot possibly meet the taxes if the plaintiff, as guardian, is required to pay the taxes on both land and buildings. No direct proof is offered as to the assesed value of the buildings on the lot between the years 1941 and 1946 but that information should be readily available from the records of the City of Anchorage.

Several years ago, by authority of an Act of Congress, the plaintiff, as guardian, was ordered to pay $25.00 per month toward the support of his ward in Morningside Hospital. Payment of a considerable sum was made pursuant to that order but the plaintiff, as guardian, has not been able to make the payments as required.

This recital of the facts brings us to the questions of law involved and the conclusions to be drawn from the law as applied to the facts.

■ 1. The lease is not void by reason of its term, namely, 15 years. The applicable provisions of Territorial law, taken from Alaska Compiled Laws Annotated, 1949, are quoted below:

"Sec. 52-1-1. Courts vested with judicial power. The judicial power in the Territory of Alaska is vested in a district court, in commissioners exercising the powers of probate courts, and in commissioners as ex officio justices of the peace."

"Sec. 61-1-2. ———— Commissioners to sit as probate court: Term: Seal: Appointment of clerk. In the exercise of the jurisdiction conferred upon commissioners by this code in the administration of the estates of deceased persons, and of minors, lunatics, and habitual drunkards, such commissioners shall sit as a probate court, which shall be always open for the transaction of business. Such court shall have a seal, upon which there shall be engraved the words 'Probate court, Territory of Alaska, ———' precinct;' and such courts may appoint a clerk who shall have the authority to attest such seal when attached to the lawful orders and certificates of such court."

"Sec. 61-1-4. Pleadings and forms. There are no particular pleadings or forms thereof in proceedings before commissioners when exercising the jurisdiction of probate matters, as specified in section 61-1-1, other than as provided in this title."

"Sec. 61-1-5. Mode of proceeding. The mode of proceeding is in the nature of a suit in equity as distinguished from an action at law. * * *"

■ A lease of the property of an incompetent person may ordinarily be made upon such terms and conditions and for such length of time as the Court in the exercise of sound discretion may approve as being for the best interest of the ward under the circumstances. 4 Bancroft Probate Practice, 2172; Ricardi v. Gaboury, 1905, 115 Tenn. 484, 89 S.W. 98. A discussion and compilation of the cases on this point relating to property of infants may be found at 121 A.L.R. 959, 964.

■ Careful distinction must be made between leases of the ward's property which have been approved by the Court and leases which are made by the guardian upon his own responsibility without Court approval. Willworth v. Leonard, 1892, 156 Mass. 277, 31 N.E. 299; Nelson v. Katzmann, 1922, 243 Mass. 240, 137 N.E. 303; Coxe v. Charles Stores Co., 215 N.C. 380, 1 S.E.2d 848, 121 A.L.R. 959, 962.

■ In this jurisdiction the Probate Court is the Court which has general authority and jurisdiction over the estates of insane and incompetent persons. It has, with respect to leases, all of the powers that are ordinarily conferred upon courts of probate anywhere, and in the Probate Court, as shown above, "the mode of proceeding is in the nature of a suit in equity as distinguished from an action at law." Sec. 61-1-5, supra. While it is true that the District Court sitting as a court of equity has general authority and jurisdiction in such matters as the one here for decision, before that power is exercised it ought to be shown to the satisfaction of this Court that the orders of the probate court so far transgress law or equity as to require modification or cancellation.

■ 2. The lease is not voidable by reason of the alleged mental insufficiency of the then guardian, James R. Campbell. The proof shows that Mr. Campbell was

gravely ill, that this illness had probably affected his capacity for any considerable period of mental concentration, that he was irritable and opinionated and, on one occasion, at least, disregarded the advice of counsel. Although the testimony of the guardian's then depressed physical and mental condition is substantial, and that testimony apparently without bias, the lease itself, if it rightly manifests the construction herein given to it, is not unconscionable, and therefore does not in itself support the contention that the guardian, in the light of the other evidence, must have been mentally incompetent to have signed it. The lease in question was witnessed by the present guardian and there is no suggestion that any of the parties or witnesses at that time expressed the thought that Mr. Campbell was mentally incompetent to make it. It is quite understandable that since Mr. Campbell had met with considerable difficulty in receiving less than $15.00 a month rental on the average for the property over a period of years, he would consider it good business to have an assured rental of $45.00 per month from a responsible tenant with the further promise that a valuable building would be erected upon the premises to become the property of the ward at the expiration of the lease. That he could not then foresee the future growth of the City of Anchorage is not necessarily a sign of mental debility.

3. The plaintiff in his amended complaint alleges that the lease was secured through improper influences used on Mr. Campbell so as to afford the defendant an unconscionable and unfair advantage and that Mr. Campbell was "overreached" by the defendant. Those averments are not sustained by the evidence. The proof fails to show that the defendant believed Mr. Campbell to be incompetent to act, or that the terms offered, as herein defined, were not fair and reasonable under the then existing conditions.

4. The lease may not be set aside by the Court, because by change of circumstances, it has become oppressive to the point of being confiscatory. Dermott v. Jones, 1864, 2 Wall. 1, 69 U.S. 1, 17 L.Ed. 762; Wells Brothers Co. v. U. S., 1920, 254 U.S. 83, 41 S.Ct. 34, 65 L.Ed. 148; U. S. v. Spearin, 1918, 248 U.S. 132, 39 S. Ct. 59, 63 L.Ed. 166; Wood v. Bartolino, 1944, 48 N.M. 175, 146 P.2d 883.

5. The lease may not be forfeited or cancelled by reason of the delay in paying rent for December 1947 after the due date thereof and by check instead of lawful money of the United States. The unbroken custom was to pay and accept rent in the form of checks of the defendant. No demand was made for the payment of rent on the due date or at any time. Moran v. Lavell, 1911, 32 R.I. 338, 79 A. 818, Ann.Cas.1912D, 1007; Godwin v. Harris, 1904, 71 Neb. 59, 98 N.W. 439, 8 Ann.Cas. 579.

6. The obligations of the parties as to payment of rentals on the building constructed by the defendant requires a different answer and that answer is that it was and is the duty of defendant under the lease, and in view of all of the circumstances surrounding the execution of the lease, to pay taxes upon the value of the building as assessed by the City of Anchorage, leaving upon the plaintiff, as guardian, the burden of paying only the taxes assessed upon the land. The second lease, the one now in question, dated February 27, 1941, makes express provision that the buildings shall become the property of the ward at the expiration of the lease. The only reasonable conclusion which can be drawn from that language is that until the date of expiration of the lease the buildings are the property of the defendant. Naturally, logically and lawfully, it is the duty of the defendant to pay municipal taxes upon its own property and not to put that uncontracted burden upon the ward or his guardian. Courts have disagreed upon similar issues presented elsewhere but the weight of reason and logic, and the mandates of equity, support the conclusion above stated.

One of the leading cases advancing the opposite view is that of People ex rel. International Nav. Co. v. Barker, 1897, 153 N.Y. 98, 47 N.E. 46, 47, but the dissenting opinion of Judge Bartlett in that case is even more persuasive than the opinion

of the Court, and therefore a part of it is quoted:

"It seems to me clear that it was the intention of the parties that the shed should remain the property of the relator until the leases expired or otherwise terminated. The language is perfectly clear. The shed is 'to become the property' of the city at the expiration of the leases. It is the well-settled law of this state that it is competent for parties by contract to so regulate their respective interests that one may be the owner of the building and another of the land. * * * [If so], it is difficult to see what legal obstacle in the case at bar prevented the contracting parties entering into covenant that the company shall erect and maintain, and replace if destroyed by fire, etc., certain structures on the wharf, to remain its property during the 20 years that these leases may possibly continue, and at the end of that period, in the express language of the contract, they are 'to become the property' of the city; that is to say, by the terms of the contract the title is then transferred. This is nothing more than a contract for the future transfer of title."

An ancient and obsolete view of the indissoluble unity of lands and improvements should not be permitted to defeat the intentions of the parties as expressed in their written contract. Even if the "twenty bishops" mentioned by way of illustration by Judge Learned Hand in his opinion in Hotchkiss v. National City Bank, D.C. 1911, 200 F. 287 293, were to prove the defendant to have believed and intended that all taxes on the building or buildings to be constructed by defendant were to be paid by the plaintiff, that proof ought not prevail over the explicit language of the lease and the inescapable inferences to be drawn therefrom.

The question may well be asked why the defendant had inserted in the lease in controversy the provision, not embraced in the earlier lease, that the building to be constructed by the lessee should become the property of the lessor at the *expiration of the lease*. Does that phrase have a meaning and an underlying purpose and intent? Or none? Why was the change made? The answer must be that if the language referred to has a meaning, that meaning is manifest and supports the conclusion here arrived at, not the one now contended for by the defendant. Moreover, we should remember that the text of the lease is the work of the defendant, not that of the plaintiff or his predecessor in trust, and therefore, the ordinary rule, 32 Am.Jur. page 133, Sec. 128 on Landlord and Tenant, that a lease is construed, in matters of ambiguity, against the lessor, goes overboard. A lease like every other contract ought to be construed in such circumstances against the party who drafted it and made choice of the language, to resort without necessity to authority, " * * * ambiguous words in an obligation should be interpreted most strongly against the party who used them." 1 Williston on Contract, revised edition, page 100 Sec. 37.

The rule on the subject here obeyed is supported in the cases of Burbank v. Board of Assessors, 1900, 52 La.Ann. 1506, 27 So. 947; Portland Terminal Company v. Hinds, 1944, 141 Me. 68, 39 A.2d 5, 154 A.L.R. 1302; and Louisville Garage Corp. v. City of Louisville, 1946, 303 Ky. 553, 198 S.W.2d 40. In the case last cited, the Court points out that there may be a severance of ownership for tax purposes and that the lessee has the control, use and enjoyment of the premises during the term of the lease and receives income therefrom; that the lessee is at least the beneficial owner of the improvements until the expiration of the lease and should contribute his share of the taxes necessary to sustain the Government which recognizes and protects its property rights.

It is true that until this suit was brought, no legal action had been taken to compel the defendant to assume any part of the tax burden on the property, but the testimony shows that there had been considerable discussion of the question and that an officer of the defendant at one time agreed that the defendant would pay the taxes although that testimony does not indicate whether the taxes then under consideration were the taxes assessed against

the buildings only or against both land and buildings. However, there is no proof that the Board of Directors of the Corporation ever assented to payment of the taxes. Although the defendant paid the municipal taxes on the property which became due on January 1, 1948, that payment was evidently made only to protect its own interests under the lease and not as an acknowledgment that the defendant was legally liable for payment of such taxes.

7. The plaintiff urges that the defendant constructed more buildings upon the premises leased than was authorized by the provisions of the lease. This argument is also without sufficient merit to warrant judicial relief.

8. Despite the delay in bringing the action, the rights of the ward should not be prejudiced by any act or omission which otherwise might be construed as laches or operate as an estoppel against the plaintiff. Wirth v. Weigand, 1909, 85 Neb. 115, 122 N.W. 714, 35 L.R.A.,N.S., 1103; 6 Bancroft's Code Practice and Remedies 6375; Hagan v. Lantry, 1935, 338 Mo. 161, 89 S.W.2d 522; 39 C.J.S., Guardian and Ward, § 73, page 114; Hammons v. National Surety Co., 1930, 36 Ariz. 459, 287 P. 292. Moreover, it should be remembered that the present guardian for many years has contended that under the terms of the lease, the defendant was, and now is, obliged to pay taxes on its own property erected by defendant on the land of plaintiff's ward.

9. In the complaint it is asserted that the lease should be cancelled by reason of the failure of the defendant to keep the property insured in accordance with the provisions of the lease. No evidence whatever was offered upon that point and so the Court must conclude that there has been no violation of the terms of the lease as respects insurance.

10. Plaintiff is entitled to recover from the defendant the amount of taxes levied by the City of Anchorage on the buildings constructed by defendant upon the premises in question from the date of construction thereof until the present time, less such credit as the defendant is justly entitled to receive, by reason of defendant's payment of taxes on both land and buildings in the year 1949, assessed in the fall of the year 1948; and for the future, the defendant is required to pay seasonably all taxes imposed upon the buildings by the City of Anchorage or by any other taxing authority, and the plaintiff is required to pay all taxes falling due upon the land. If necessary, additional proof may be taken as to the amount of taxes on buildings and on land for the years between 1941 and 1946. Under the circumstances, it does not appear proper that any damages should be assessed against the defendant for failure to pay the municipal taxes on the buildings erected by defendant on the premises involved.

11. Plaintiff may recover costs of action.