BAYER CORPORATION, Plaintiff,

v.

CHESTNUT ACQUISITION CORPORA-TION, ChemDesign Corporation, and Specialty–Chem Products Corporation, Defendants.

No. 02 CIV 0941 LAK.

United States District Court, S.D. New York.

March 14, 2002.

Robert W. Gaffey, Mark S. Mandel, Jennifer W. Cohen, Jones, Day, Reavis & Pogue, for Plaintiff.

Glenn M. Kurtz, Robert Kelly, Meghan McCurdy, White & Case LLP, for Defendants.

### MEMORANDUM OPINION

KAPLAN, District Judge.

The issue in this declaratory judgment action is which entity, as between the sell-

er of the shares of two of its former wholly owned subsidiaries, the buyer, and the subsidiaries themselves, is responsible for continuing to provide long term disability benefits for eleven of the subsidiaries' disabled personnel following the sale. One would have hoped that the entities involved would have reached some reasonable accommodation in light of the difficulties in which these eleven individuals, some of whom are seriously ill, find themselves. Unfortunately, that hope has not been realized.

I

*A.  The Marketing of the Companies*

At the outset of the relevant period, Bayer Corporation ("Bayer") owned all of the outstanding capital stock of ChemDesign Corporation, which in turn owned all of the outstanding capital stock of SpecialtyChem Products. (The latter two entities are referred to collectively as the "Companies").

The Companies, as is common, provided their employees with an array of employee benefits, among them long term disability coverage. The means by which it did so was to pay Bayer for the right to have its employees included in the Bayer plan, which made coverage available to employees of Bayer and its affiliates.

Some time in 2001, Bayer decided to sell the Companies and caused its investment banker to prepare a descriptive memorandum that was used to interest prospective purchasers. The memorandum came to the attention of John Van Hulle of Chestnut Acquisition Corporation ("Chestnut"),

who attended a presentation for potential purchasers with representatives of Bayer, the Companies, and Bayer's investment bankers in July 2001.[1] Among the inducements held out was Bayer's intention to assume certain of the Companies' liabilities, including liabilities relating to retirement and employee welfare benefits, prior to closing.[2] *Pro forma* financial statements were distributed which showed, among other things, that the intercompany obligations of the Companies to Bayer would be eliminated.[3] Among the so-called excluded liabilities was general ledger account number 26710, which included, among other things, costs in respect of long term disability coverage allocated to the Companies by Bayer. The balance in that account was approximately $3.8 million.[4] Prospective buyers were told that the elimination of these obligations should increase the price they were willing to pay.[5]

*B.  The Contracts*

Chestnut was the successful bidder. The parties executed a Stock Purchase Agreement ("SPA") and an Assignment and Assumption Agreement ("AAA"), among other documents.

*1.  The SPA*

The SPA contained several provisions pertinent to this dispute.

First, Bayer warranted and represented that the Companies' financial statements "present fairly, in all material respects, the consolidated financial position of the Com-

---

1.  Van Hulle St. ¶ 2–3.

    In order to expedite the trial, the direct testimony of all witnesses was submitted in the form of statements which the witnesses adopted on the stand. These are referred to by the name of the witness followed by "St."

2.  *Id.* ¶¶ 3–5.

3.  *Id.* ¶¶ 6–7; DX 2, at 97–101.

4.  Van Hulle St. ¶ 15.

5.  *Id.* ¶ 7.

panies as of the date thereof," that the Companies had no material liabilities (whether or not required to be disclosed on their balance sheets in accordance with generally accepted accounting principles) as of the date of the transaction except as set forth on their balance sheets or otherwise disclosed, that one of the schedules to the SPA listed each of the Companies' "Employees" (a term defined to include inactive employees), and that neither of the Companies had any liability or was obligated to contribute to any employee benefit plan except as set forth on a disclosure schedule.[6]  The schedule referred to in the employee representation and warranty listed only some of the eleven inactive employees whose benefits are here at issue.[7]  The disclosure schedule, insofar as is relevant here, listed only obligations to the Bayer Corporation Disability Plan.[8]

Second, Section 5.1(b) of the SPA provided in relevant part:

> "Except as provided below, Purchaser [Chestnut] will provide coverage for Employees beginning as of the date hereof... under the employee benefit plans and programs ... currently maintained by Purchaser for similarly situated employees of Purchaser.... The Companies will continue to be responsible for payment of any salary, medical benefit or disability benefit to any Inactive Employee who is receiving or has qualified to receive such payment as of the date hereof."[9]

"Inactive Employees" was defined to mean "all employees of the Companies whose employment is primarily or exclusively related to the Business and who are listed in Section 5.1(c)(ii) of the Disclosure Schedule and who, as of the date hereof, are on a nonmedical leave or short or long-term disability."[10]  Section 5.4 went on to say that "Seller [Bayer] will take, or will cause to be taken, all action necessary to cause [the Companies] to cease participating in the Employee Benefit Plans sponsored by Seller ..., effective as of the date hereof."[11]

Finally, Article VIII of the SPA defined the term "Excluded Liabilities" as those listed in Section 8.2 of the Disclosure Schedule.[12]  Schedule 8.2 in turn listed, among other things, $3.8 million of accrued intercompany debt due to Bayer under general ledger account 26710 in respect of retirement and welfare employee benefits.[13]  Bayer, by virtue of Section 6.2, agreed to indemnify Chestnut for "the liabilities associated with the Excluded Liabilities ... and any claims related thereto."[14]

### 2. The AAA

The pivotal provision of the AAA was Section 2, under which Bayer "assume[d] and agree[d] to pay, perform and discharge when due, the obligations and liabilities of the [Companies] described on Schedule B hereto."[15]  These assumed liabilities are precisely the same as the Excluded Liabilities defined in the SPA. In

---

6. SPA §§ 2.5(a)-(b) (financial statements, liabilities), 2.15(b) (employees), 2.16(a) (benefit plans), 5.1(c) (definitions).

7. SPA Disc. Sched. § 5.1(c)(ii).

8. *Id.* § 2.16.

9. SPA § 5.1(b).

10. *Id.* § 5.1(c).

11. *Id.* § 5.4.

12. *Id.* at 39.

13. SPA Disc. Sched. § 8.2.

14. SPA § 6.2.

15. AAA § 2.

other words, by Section 2 the Companies assigned to Bayer, and Bayer agreed to assume, all of the Excluded Liabilities.[16] Thus, one effect of Section 2 of the AAA was to extinguish the Companies' liability to Bayer for participation in its disability benefit plan. As we shall see, this was not the only effect.

Sections 3 also is said by one or the other of the parties to be of some relevance. Section 3 released the Companies from all obligations relating to the Excluded Liabilities.[17]

## C. The Disabled Employees and the Dispute

Prior to the acquisition, eleven individuals who had worked for the Companies were receiving disability benefits under the Bayer (then Miles) disability plan. Upon the occurrence of the acquisition, they ceased to be employees or former employees of a Bayer affiliate and therefore no longer are eligible for its plan in its current form.[18] Bayer, moreover, argues that the obligation to provide disability coverage to these individuals always was that of the Companies and that the Companies agreed in Section 5.1(b) of the SPA to "continue to be responsible for payment of" those benefits on the theory that these individuals are "Inactive Employee[s] who [were] receiving or [were] qualified to receive such payment as of the date hereof." [19]

Chestnut takes a very different position. It argues that the premise of the entire deal—reflected in the original presentation, the discharge of the Companies' intercompany obligation to Bayer in respect of the retirement plan, and other circumstances—was that it was buying the Companies free of any obligation to these individuals, the existence of at least some of whom was not even acknowledged in the Disclosure Schedule. Chestnut contends that, by excluding the liability for the intercompany obligation and assuming that liability in the AAA, Bayer assumed the obligation to provide those benefits.

It appears that the hardened positions of both sides have left the employees entirely out in the cold.

## D. Prior Proceedings

Bayer commenced this declaratory judgment action and immediately sought advancement of the matter pursuant to FED. R. CIV. P. 57 in view of the potential adverse effects of the dispute on the individual disabled persons. The parties were unable to work out a mutually acceptable interim *modus operandi* to ensure that these individuals would receive benefits until the case is resolved, with the loser ultimately to bear the entire financial burden. Accordingly, the Court set the declaratory judgment action for immediate trial. Although Chestnut has interposed counterclaims for, *inter alia*, indemnification by Bayer for any liability it may have to provide the benefits, the parties agreed to sever the counterclaims, on which there is a jury demand, in order to permit prompt trial of the declaratory judgment action. Both sides waived a jury on the declaratory judgment action and, further, agreed that any findings the Court makes in the declaratory judgment action will be binding with respect to the counterclaims notwithstanding any right either otherwise would have had to a jury determination of

---

16. *Compare* SPA Disc. Sched. § 8.2, *with* AAA Sched. B.

17. AAA § 3.

18. Yenerall St. ¶ 6.

19. *See id.* ¶¶ 10–13.

those issues.[20] In addition, the Companies were added as defendants during the trial.[21]

This is the Court's decision following trial of the declaratory judgment action.

## II

A contract of course should be construed to give effect to all of its parts.[22] Where the contract is clear, its construction presents a question of law for the Court to be decided on the basis of the document alone.[23] If it is ambiguous—that is, if it reasonably might yield two or more interpretations—extrinsic evidence is admissible to assist in determining the intention of the parties.[24] And the intention that governs is that which is discerned from their objective manifestations of agreement; subjective, uncommunicated intentions are not material.[25]

■ Bayer argues that neither it nor its plan has any further liability in respect of these individuals in consequence of Sections 5.1(b) and 5.4 of the SPA. Section 5.1(b), as noted above, provides that "[t]he Companies will continue to be responsible for payment of any salary, medical benefit or disability benefit to any Inactive Employee who is receiving . . . such payment as of the date hereof." Section 5.4 requires

Chestnut to cause the Companies to cease participating in Bayer's benefit plans. But this argument, while not without some initial appeal, is far from conclusive.

To begin with, the Companies arguably never were responsible for payment of any long term disability benefits to any of these individuals. They made available to their employees the opportunity to participate in the Bayer disability plan and paid Bayer something in respect of their participation. But any benefits paid were paid by the Bayer disability plan. This is distinct from the situation with respect to short term disability, which the Companies paid both before and after the acquisition.[26]

Second, the term Inactive Employee is defined in the SPA in relevant part as "employees of the Companies whose employment is primarily or exclusively related to the Business and who are listed in Section 5.1(c)(ii) of the Disclosure Schedule."[27] But it was the practice of the Companies, perhaps unlike that of Bayer itself, to terminate employees at the end of their periods of short term disability,[28] so it appears that none of the individuals in question still is an employee, much less one whose employment is primarily or ex-

---

**20.** In effect, the parties have waived the protection of *Beacon Theatres, Inc. v. Westover,* 359 U.S. 500, 504, 508, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959), and *Dairy Queen, Inc. v. Wood,* 369 U.S. 469, 479, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962).

**21.** Tr. 4–6.

**22.** *E.g., Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd.,* 230 F.3d 549, 558 (2d Cir.2000); *New York v. Oneida Indian Nation,* 90 F.3d 58, 62 (2d Cir.1996).

**23.** *E.g., Metro. Life Ins. Co. v. RJR Nabisco, Inc.,* 906 F.2d 884, 889 (2d Cir.1990).

**24.** *E.g., Investors Ins. Co. v. Dorinco Reins. Co.,* 917 F.2d 100, 104 (2d Cir.1990); *Hanley*

*v. Lark Deli Corp.,* 2 F.Supp.2d 534, 537 (S.D.N.Y.1998), *aff'd sub nom. Hanley v. Deluxe Caterers of Shelter Rock, Inc.,* 175 F.3d 1007 (2d Cir.1999) (table).

**25.** *E.g., Hotchkiss v. Nat'l City Bank,* 200 F. 287, 293 (S.D.N.Y.1911), *aff'd,* 201 F. 664 (2d Cir.1912), *aff'd,* 231 U.S. 50, 34 S.Ct. 20, 58 L.Ed. 115 (1913).

**26.** McCracken St. ¶ 25.

**27.** SPA § 5.1(c).

**28.** Tr. 38–43; DX 11, at 15; DX 12, at 16; DX 14–16.

clusively related to the business. Even if the Companies are regarded as having paid disability benefits in the past, it is far from clear that they were paying them to Inactive Employees as defined in the SPA. Hence, the applicability of the last sentence of Section 5.1(b) is far from clear.

At this first stage of the analysis, the issue is not which of these two constructions is more appealing. It suffices for present purposes to note that these difficulties, not to mention others, render the contracts susceptible of at least two reasonable interpretations. They therefore are ambiguous, thus permitting consideration of parol evidence.

### III

■ This transaction was structured as a purchase by Chestnut of the stock of the Companies. Absent special agreements between parties to such a transaction, the companies whose stock is sold remain liable for their obligations, including debts owed to the seller. The seller simply transfers the companies' shares. The critical question here is whether Bayer and Chestnut reached some different agreement with respect to liability for these benefits.

■ As in any contract case, the objective here is to give effect to the reasonable expectations of the parties. The Court is somewhat handicapped in doing so, however, because there was no discussion of this issue during the negotiation of the deal.[29] Thus, it is entirely possible that, in the words of an ancient proverb, these parties were sleeping in the same bed but dreaming different dreams—that Bayer, if it

thought about the subject at all, believed or hoped that it was getting rid of this obligation while Chestnut thought that the responsibility, to the extent it was aware of any responsibility, would be assumed by Bayer. But that is neither here nor there. In Judge Learned Hand's famous words, later adopted by the New York Court of Appeals:[30]

"A contract has, strictly speaking, nothing to do with the personal, or individual, intent of the parties. A contract is an obligation attached by the mere force of law to certain acts of the parties, usually words, which ordinarily accompany and represent a known intent. If, however, it were proved by twenty bishops that either party, when he used the words, intended something else than the usual meaning which the law imposes upon them, he would still be held, unless there were some mutual mistake, or something else of the sort. Of course, if it appear by other words, or acts, of the parties, that they attribute a peculiar meaning to such words as they use in the contract, that meaning will prevail, but only by virtue of the other words, and not because of their unexpressed intent."[31]

Thus, the Court is obliged to determine the reasonable expectations of the parties not by choosing between their present assertions of what they thought or intended at the time, but by assessing the reasonable meaning of the words of the contracts, in light of the circumstances in which the parties assented to them, including what they said to each other. The Court finds several factors especially persuasive.

---

**29.** Tr. 23–24; 48.
Indeed, the Court is persuaded that there were no internal discussions at Bayer with respect to the possibility of the Companies assuming the obligations here at issue. *See* Tr. 25.

**30.** *Mencher v. Weiss*, 306 N.Y. 1, 7–8, 114 N.E.2d 177 (1953).

**31.** *Hotchkiss*, 200 F. at 293.

To begin with, the lack of any discussion of this issue in the negotiation of the deal is significant. This was a $3.5 million stock sale. The Companies were losing money at the time of the transaction, so their anticipated future costs were of pivotal importance to prospective purchasers. The benefits payable to these eleven employees exceed $288,000 per year, or almost 10 percent of the purchase price. Their present value is over $3.2 million.[32] The lack of any discussion of the issue in these circumstances, taken together with the fact that Bayer touted the deal to prospective purchasers in a manner that arguably implied that any liabilities for former employees would remain with Bayer, as it did by representing that it would eliminate the intercompany obligation in respect of the retirement and disability plans, makes it more likely than not that Bayer created the impression that the liability with respect to former employees would remain with Bayer.[33] Indeed, the expense reports that Bayer provided to prospective purchasers reflected no expenditures in respect of long term disability obligations.[34]

Even more compelling is the AAA. Section 3 released the Companies from all obligations relating to the Excluded Liabilities, including general ledger account 26710. But the AAA did not stop there.

Rather, the Companies' liability to Bayer was defined in the AAA as an Assumed Liability. In Section 2, Bayer contracted to "assume[ ] and ... to pay, perform and discharge when due, the" Assumed Liabilities.[35] But how does an assignee "perform" a liability of the assignor to the assignee? The assignment itself extinguishes the liability. Hence, Bayer's covenant to "perform and discharge" the intercompany obligation reflected in general ledger account 26710 would be entirely meaningless unless it imported something more than the release of the obligation. The only meaning that makes sense of that language is that Bayer thereby assumed the responsibility to pay the benefits in respect of which the liabilities in that account were accrued. Since the liabilities in that account reflected the cost of future benefits to disabled former employees,[36] the AAA is best construed as an assumption by Bayer of the obligation to pay those benefits.

Third, the Summary Plan Description for the Bayer plan lists events, the occurrence of which would result in termination of benefits. A change of control such as occurred here is not among them.[37] In consequence, the plan description itself, which was made available to Chestnut in

---

**32.** Handley St. ¶ 8.

**33.** This is true despite the fact that, following the closing, there was a difference of view on defendants' side as to whether Bayer was obliged by the agreements to pay these benefits. *Compare* PX B (agreement silent), *with* DX 20 (Bayer retaining responsibility).

**34.** Tr. 102.

**35.** AAA § 2.

**36.** Under Financial Accounting Standard (FAS) No. 112, generally accepted accounting principles require accrual basis employers to accrue liabilities for future disability benefits during an employee's active service. Cantor St. ¶ 7; Tr. 106. This reflects an overall goal of accrual basis accounting—reflection of costs associated with the generation of revenue in the period in which the revenue is recognized—in that the liability to pay future disability benefits is a cost of generating revenue during the employee's active employment. *Id.* at 107–08. Thus, when an employee is terminated or otherwise leaves the payroll, the employer ceases to accrue in respect of liability for payment of future benefits to that employee. *Id.* at 65.

**37.** DX 10, at 1449–50; Tr. 50–55.

due diligence,[38] suggested that employees already receiving benefits under the Bayer plan prior to a change·of control would continue to do so thereafter.

Finally, while there is some disagreement in this case concerning FAS 112, this much is clear. Under FAS 112, the Companies were obliged to reflect on their balance sheets an accrued liability in respect of their obligation to make future benefit payments.[39] The consolidated *pro forma* balance sheet furnished to Chestnut by Bayer reflected no such accrual.[40] Bayer, moreover, represented and warranted, that the statement fairly presented, in all material respects, the consolidated financial position of the Companies and that there were no liabilities as of the date of the transaction except as there stated.[41] That representation and warranty lends support to the view that the parties expected that Bayer would remain liable to pay benefits to these former employees.

As noted above, Bayer nevertheless argues that Sections 5.1(b) and 5.4 are inconsistent with this interpretation of the agreements. But its position ultimately is not sufficiently persuasive. Section 5.1(b) is easily reconciled with this construction by virtue of the fact that the Companies have paid short-term disability benefits both before and after the acquisition,[42] which is sufficient to explain the reference to the Companies' continued responsibility for disability benefits in a manner consistent with the conclusion stated above..

Nor is Section 5.4 an obstacle. It says that the Companies were obliged to cease offering their employees the opportunity to participate in the Bayer plans. There is no dispute that the Companies have ceased participation in the Bayer plans going forward and adopted plans of their own. Section 5.4, however, simply does not address the status of employees who already had become eligible for benefits under the Bayer plans. Thus, there is no inconsistency in holding that Bayer now is responsible for their benefits.

## IV

For the foregoing reasons, the Court is persuaded that the obligation to continue benefit payments to these eleven employees was assumed by Bayer and, as between Bayer and the defendants, is not the responsibility of Chestnut or the Companies. While the Court recognizes that this may require changes to Bayer's plan or, alternatively, that Bayer pay the benefits itself, this is a problem of its own making. If it wished to rid itself of this obligation, it should have been far more explicit and careful in its dealings with Chestnut.

A declaratory judgment will enter determining that Bayer is responsible for paying the disability benefits to the eleven employees here at issue and that neither Chestnut nor the other defendants, as between them and Bayer, is responsible for doing so. As this moots Chestnut's counterclaims, those are dismissed. The Court has considered Bayer's other arguments and found them to lack merit. These constitute the Court's findings of fact and conclusions of law.

Settle judgment on two days' notice.

SO ORDERED.

---

**38.**   Van Hulle St. ¶ 10; *see* PX H, at 36.

**39.**   Cantor St. ¶¶ 7–8.

**40.**   *Id.* ¶¶ 11–12; McCracken St. ¶ 24.

**41.**   SPA § 2.5(a)-(b).

**42.**   McCracken St. ¶ 25.