**Fred WARD, Plaintiff,**

v.

**The NATIONAL GEOGRAPHIC SOCIETY, et al., Defendants.**

**No. 99 CIV. 12385(LAK).**

United States District Court, S.D. New York.

July 13, 2002.

Andrew Berger, Tannenbaum, Helpern, Syracuse & Hirschtritt, New York City, for Plaintiff Fred Ward.

Robert G. Sugarman, Naomi Jane Gray, Joanne McLaren, Pierre M. Davis, Armelle Nina VanDorp, Weil, Gotshal & Manges LLP, New York City, Terrence B. Adamson, National Geographic Society, Washington, DC, for Defendants National Geographic Society and National Geographic Enterprises, Inc.

## MEMORANDUM OPINION

KAPLAN, District Judge.

Defendants National Geographic Society ("NGS"), National Geographic Enterprises, Inc. ("NGE"), Mindscape Inc. ("Mindscape"), and Dataware Technologies, Inc. ("Dataware") produce and market "The Complete National Geographic," a digital archive of all past issues of *National Geographic Magazine* (the *"Magazine"*) on

CD–ROM and DVD. Plaintiff Fred Ward, a freelance photographer and writer, claims that the production and sale of this product violates his intellectual property rights in photographs and text that originally appeared in the print version of the *Magazine*. He alleges claims of infringement under the Copyright Acts of 1909 (the "1909 Act") and 1976 (the "1976 Act"), as well as a violation of the Digital Millennium Copyright Act (the "DMCA"). The matter is before the Court on defendants' motion for partial summary judgment dismissing the complaint with respect to claims based on Mr. Ward's photographs and text that appeared in the *Magazine* before 1978 (the "Pre–1978 Works").

### Facts

#### Fred Ward

Fred Ward was hired by NGS as an independent contractor to write and photograph numerous stories published in the *Magazine* between 1964 and 1978. Text and/or photographs from 10 stories are at issue on this motion. They include (1) "Costa Rica," published in July 1965, (2) "Singing Birds," published in October 1965, (3) "National Parks/Parkscape USA,"[1] published in July 1966, (4) "Leeward Islands," published in October 1966, (5) "The Living White House," published in November 1966, (6) "Sharks," published in February 1968, (7) "Rhode Island," published in September 1968, (8) "Everglades," published in January 1972, (9) "Those Successful Japanese," published in March 1974, and (10) "Cree Indians," published in April 1975.[2]

Plaintiff did not independently register any of these works during their initial copyright terms. He did, however, obtain renewal registrations for all the Pre–1978 Works except those associated with the Those Successful Japanese and Cree Indians stories, which still are in their initial terms. The Copyright Office denied Mr. Ward's applications for initial registration of the works associated with the two latter stories on July 10, 2000.

#### Defendants

NGS is the world's largest nonprofit scientific and educational organization, with approximately ten million members worldwide. In 1995, NGS placed its television and, subsequently, its interactive and a portion of its cartography divisions into a wholly-owned taxable subsidiary named National Geographic Ventures, Inc. ("NGV"). NGV in turn owns NGE, among the divisions of which is National Geographic Interactive ("NGI").[3]

The *Magazine* is the monthly official journal of NGS, published in print format since 1888. In December 1996, NGS granted NGV the nonexclusive right to use photographs and text included in the archive of the *Magazine* ("in archival form only, without manipulation or alteration") for the development and distribution of various multimedia products.[4]

Mindscape[5] is a computer software publisher and distributor. In September 1996,

---

1. Although Mr. Ward listed National Parks and Parkscape USA separately in the Amended Complaint, *see* Am. Cpt. ¶ 19, the Court treats these stories together in light of Mr. Ward's deposition testimony that the photographs for National Parks and Parkscape USA were "part of the same article" and that "it was the same thing … the article was broken into pieces." Ward Dep. 37.

2. The titles used here are not necessarily the titles exactly as they appeared in the *Maga-*

*zine*. The Court uses these shorthand forms for the sake of convenience.

3. Pl. 56.1 St. ¶ 2; Fahey Decl. ¶¶ 2, 4.

4. Plaintiff's Exhibits Submitted in Support of His Summary Judgment Motion ("Pl. Supp. Summary Judgment") Ex. 18 ¶ 2 & attach. B.

5. Encore, Inc. ("Encore") succeeded Mindscape as the manufacturer and distributor of

it entered into an agreement with NGE through its division, NGI, whereby Mindscape would manufacture, market, and distribute CD–ROM products created by NGS, including The Complete National Geographic. The agreement granted Mindscape the sole and exclusive right to manufacture, reproduce, and distribute certain multimedia products based on an archive of the *Magazine,* including The Complete National Geographic.[6] In return, Mindscape granted NGI the right to receive royalties on its sales of The Complete National Geographic and other related multimedia products.[7]

Dataware, now known as LeadingSide, Inc., is a developer of interactive software for the purpose of information retrieval and electronic publishing applications. In August 1996, Ledge Multimedia, then a division of Dataware, entered into an agreement with NGS.[8] The purpose of the agreement was for Dataware to manage the development of The Complete National Geographic archive. It required Dataware to develop a custom CD–ROM template, including integration of a custom set of interfaces to display magazine pages, a search engine and JPEG[9] images of the scanned magazine pages. After completing this process, Dataware shipped the prototype CD–ROMs to Mindscape at its California offices for reproduction and mass distribution.[10]

### The Complete National Geographic

In 1996, NGS developed a proposal to reproduce all issues of the *Magazine* published between 1888 and 1996 in CD–ROM format. The product was produced in significant part through a process of digital scanning. Each issue of the *Magazine* published between 1888 and 1996 was scanned, page by page, into a computer system. The scanning process created an exact image of each page as it appeared in the *Magazine.*[11] The issues of the *Magazine* appear chronologically, from the earliest at the beginning of the first disc to the latest at the end of the thirtieth disc.

"The Complete National Geographic: 108 Years of National Geographic Magazine on CD–ROM" ("CD–ROM 108"), which was introduced to the marketplace in 1997, has three components. The first is a multimedia sequence that displays NGS's logo, followed by a promotional message for Kodak and a sequence depicting the covers of ten issues of the *Magazine* that transition digitally from one into another. The multimedia sequence plays the first time a user boots up CD–ROM 108 and at the beginning of each subsequent session. In subsequent sessions, however, the user can skip the sequence by clicking on the logo once. The second component consists of the digital reproduction of the issues of the *Magazine.* The third is the computer program that serves

---

the Complete National Geographic in 2001. Letter from Robert G. Sugarman to the Court (June 24, 2002) (the "June 24, 2002 Letter").

6. Fahey Decl. Ex. B ¶¶ 1, 2; Pl. Supp. Summary Judgment Ex. 19 ¶¶ 1.1.5, 3.1.

7. Fahey Decl. Ex. B ¶ 5; Pl. Supp. Summary Judgment Ex. 19 ¶ 9.1.

8. Fahey Decl. Ex. C.

9. "JPEG" is short for Joint Photographic Experts Group and is pronounced "jay-peg." It

is a compression technique for digital color images, which can reduce file sizes to about 5 percent of their normal size. Some detail is lost in the compression. *Webop;edia,* at <http://www.pcwebopedia.com/TERM/J/JPEG.html> (last visited Feb. 13, 2002).

10. *Compare* Pl. 56.1 St. ¶ 18, *with* Def. 56.1 St. ¶ 18.

11. *Compare* Pl. 56.1 St. ¶ 8, *with* Def. 56.1 St. ¶ 8.

as the storage repository and retrieval system for the *Magazine* images.

The parties dispute exactly what Complete National Geographic products other than CD–ROM 108 have reached the market. At the very least, however, defendants have admitted to release of the following products: (a) "The Complete National Geographic: 109 Years of National Geographic Magazine on CD–ROM" ("CD–ROM 109"), published in 1998; (b) "The Complete National Geographic: 109 Years of National Geographic Magazine on DVD" ("DVD 109"), published in 1998; (c) "The Complete National Geographic: 110 Years of National Geographic Magazine on CD–ROM" ("CD–ROM 110"), published in 1999; and (d) "The Complete National Geographic: 110 Years of National Geographic Magazine on DVD" ("DVD 110"), published in 1999.[12] Mindscape has distributed also "decade sets" of The Complete National Geographic, which contained, in CD–ROM format, issues of the *Magazine* from various decades in history.[13]

Each of the Complete National Geographic products displays a copyright notice in the name of NGS. The notice appears on the product packaging as well as on any pages that are printed out from the product.[14] The consumer licensing agreement accompanying CD–ROM 108 advised end-users that "Mindscape and its suppliers grant you the right to use one copy of the Program for your personal use only" and that "[y]ou must treat the [p]rogram and associated materials and any elements thereof like any other copyrighted material."[15] The CD–ROM 108 packaging informed the consumer that he or she may "[p]rint any article or photograph in color or black and white."[16]

*The Professional Relationship Between Ward and NGS*

Mr. Ward worked as a freelance photographer and writer for NGS during the 1960's and 1970's. In some instances, the

---

**12.** Fahey Decl. ¶ 11.

**13.** *Id.* ¶ 12. Since this motion became *sub judice,* the defendants have released also "The Complete National Geographic: 112 Years of National Geographic Magazine on CD–ROM" ("CD–ROM 112"). *See* <http://www. nationalgeographic. com/cdrom/complete/index. html> (last visited July 9, 2002).

**14.** Pl. 56.1 St. ¶ 14.

**15.** Fahey Decl. Ex. A. In the initial version of CD–ROM 112, Encore included on the product's installation disc an end-user license agreement that indicated that the CD–ROM contained "clipart and photo images" that the consumer was "free to use, modify and publish ... as you wish ...." *See* Ex., Letter from Stephen A. Weingrad to the Court (June 25, 2002) (the "June 25, 2002 Letter"). NGS asserts that it did not authorize Encore to include this language in the licensing agreement and that it has taken steps to rectify the situation, including ceasing distribution of all copies of the product containing this end-user agreement and requiring Encore to send re-call notices to distributors and retailers holding inventory and to send notification of the error and a corrected license to previous purchasers of CD–ROM 112. *See* June 24, 2002 Letter.

The letter sent by Encore to purchasers draws their attention to the above-quoted language and states that "all of the photographs, illustrations, texts, and graphs in the product are copyrighted by the National Geographic Society or its licensors ..., and we do not have the authority to give you all of these rights." Ex., June 25, 2002 Letter. The replacement license agreement states that end-users may not "[r]eproduce, republish or reuse any photograph or any other element or content of the Software, individually or in combination, but applicable copyright law may give you such rights." *Id.* The language removed from the initial CD–ROM 112 license agreement was not included in earlier versions of The Complete National Geographic. *See* Fahey Decl. Ex. A.

**16.** Fahey Decl. Ex. A.

terms of his assignments were memorialized in writing.[17] In his Rule 56.1 Statement, plaintiff admitted the following facts for purposes of this motion: (1) plaintiff created the photographs and/or texts for the Costa Rica, Sharks, National Parks/Parkscape USA, Leeward Islands, Rhode Island, Everglades, and Those Successful Japanese stories pursuant to assignments from NGS, (2) NGS paid Ward a minimum guarantee for his contributions to all of these stories, and (3) NGS paid Ward's expenses for the Costa Rica, Sharks, National Parks/Parkscape USA, Rhode Island, and Those Successful Japanese stories.[18]

Nor can it seriously be disputed that plaintiff created the photographs and text for the Cree Indians story pursuant to an assignment from NGS, and that NGS paid him a minimum guarantee and expenses for his contributions to this story.[19] The letter contract for this story, which was written by Robert Gilka and dated June 13, 1973, clearly provided that NGS "will retain all rights to the photographs [NGS] publish[es] in the Cree Indians article" and "return ... all photographs in which [NGS] ha[s] no further interest." [20]

Finally, defendants admit for purposes of this motion that Ward's photograph of John F. Kennedy in the Oval Office, published in The Living White House story, was not created as a work for hire.[21] As will be discussed in greater detail below, the remaining contours of the Ward–NGS relationship during the relevant time period remain subject to dispute.

*Discussion*

## I. Summary Judgment

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.[22] While the burden rests on the moving party to demonstrate the absence of a genuine issue of material fact,[23] and the Court must view the facts in the light most favorable to the nonmoving party,[24] a defendant may prevail if it can demonstrate that the plaintiff cannot establish an essential element of its claim.[25] Where, as here, the burden of proof at trial lies with the nonmoving party, it ordinarily is sufficient for the moving party to point to a lack of

---

17. The parties have submitted something approximating a written contract for the Costa Rica, Rhode Island, Everglades, and Cree Indians projects. Ward stated in his deposition that there was no written contract for the following assignments: Singing Birds, National Parks/Parkscape USA, Leeward Islands, The Living White House, and Sharks. Ward Dep. 34. Defendants have not contradicted him on this point. However, in many instances the parties have submitted documents, such as payments records and cover letters accompanying the return of film, from which the Court can deduce certain aspects of the professional relationship.

18. Pl. 56.1 St. ¶¶ 23–29.

19. Reply Appendix of Exhibits and Deposition Testimony in Further Support of Defendants' Motion for Summary Judgment ("Def. Reply

App.") Ex. J–11. Plaintiff has presented no evidence to contradict the plain terms of the agreement set forth in the June 13, 1973 letter to Mr. Ward from Robert Gilka.

20. *Id.*

21. Def. 56.1 St. ¶ 20; Def. Mem. 12 n. 12.

22. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

23. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

24. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962).

25. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

evidence on an issue sufficient to go to the trier of fact. In that event, the nonmoving party must come forward with admissible evidence [26] sufficient to raise a genuine issue for trial in order to avoid summary judgment.[27]

## II. Copyright Infringement

To make out a claim for copyright infringement, a plaintiff must establish (1) ownership of a valid copyright, and (2) copying.[28] In this motion, defendants raise arguments attacking primarily plaintiff's ownership of valid copyrights.

### A. Work For Hire

◼ Defendants claim that Mr. Ward

created the Pre–1978 Works as works for hire for NGS and that NGS owns the copyright in those works, thus entitling defendants to judgment as a matter of law.[29] Under the 1909 Act, an independent contractor was an "employee" and a hiring party an "employer" if the work was made at the hiring party's "instance and expense," provided also that the employer had the right to exercise control over the manner in which the artist executed the work.[30] "Once it is established that a work is made for hire, the hiring party is presumed to be the author of the work. That presumption can be overcome, however, by evidence of a contrary agreement, either written or oral."[31] At trial, the burden is

26. *See, e.g., Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 269 F.3d 114, 123–24 (2d Cir.2001); *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736, 746 (2d Cir.1998); *Raskin v. Wyatt Co.,* 125 F.3d 55, 65–66 (2d Cir.1997).

27. *E.g., Nebraska v. Wyoming,* 507 U.S. 584, 590, 113 S.Ct. 1689, 123 L.Ed.2d 317 (1993) (when nonmoving party bears burden of proof at trial, moving party is entitled to summary judgment if nonmovant fails to make showing on essential element of its claim); *Goenaga v. March of Dimes Birth Defects Found.,* 51 F.3d 14, 18 (2d Cir.1995) ("In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim.") (citing *Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548). *But see Davis v. City of New York,* 142 F.Supp.2d 461, 467 (S.D.N.Y.2001) (noting that the purpose of Rule 56 is "to isolate and dispose of factually unsupported claims or defenses" and holding that " '[f]actually unsupported' claims or defenses cannot include those for which factual support may exist, but is unavailable to the non-moving party simply because the movant is the only one with personal knowledge of the facts").

28. 4 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT § 13.01, at 13–5 & n. 5 (2001) (hereinafter NIMMER) (citing *Reyher v. Children's Television Workshop,* 533 F.2d 87 (2d Cir.), *cert. denied,* 429 U.S. 980, 97 S.Ct. 492, 50 L.Ed.2d 588 (1976)).

29. Def. Mem. 11.

30. *Playboy Enters., Inc. v. Dumas,* 960 F.Supp. 710, 713 (S.D.N.Y.1997), *aff'd,* 159 F.3d 1347 (2d Cir.1998) (table opinion). This latter requirement will be referred to alternately throughout as the "control" requirement and the "supervision" requirement.

31. *Playboy Enters., Inc. v. Dumas,* 53 F.3d 549, 554 (2d Cir.), *cert. denied,* 516 U.S. 1010, 116 S.Ct. 567, 133 L.Ed.2d 491 (1995). Although the language quoted in the text appears to require an express contract ("either written or oral"), as opposed to an implied-in-fact contract, the better view is that an implied-in-fact contract will suffice. The case cited by the Second Circuit in *Dumas, Roth v. Pritikin,* 710 F.2d 934 (2d Cir.), *cert. denied,* 464 U.S. 961, 104 S.Ct. 394, 78 L.Ed.2d 337 (1983), imposed no requirement that the agreement be express. *See id.* at 937 n. 3 (requiring "contrary evidence" to overcome the presumption). The *Roth* court itself cited *Yardley v. Houghton Mifflin Co.,* 108 F.2d 28 (2d Cir.1939), *cert. denied,* 309 U.S. 686, 60 S.Ct. 891, 84 L.Ed. 1029 (1940), which indicated that an implied-in-fact agreement could overcome the presumption. *See id.* at 31 ("If [the artist] is solicited by a patron to execute a commission for pay, the presumption should be indulged that the patron desires to control the publication of copies and that the artist consents that he may, unless by the terms of the contract, *express or implicit,* the artist has reserved the copyright to himself." (emphasis added)).

on the independent contractor to demonstrate by a preponderance that such a contrary agreement was reached.[32]

Here, defendants have met the "instance" and "expense" prongs as a matter of law for all of the Pre–1978 Works except The Living White House.[33] Plaintiff's admissions in his Rule 56.1 Statement,[34] the letter contract sent to Mr. Ward by Robert Gilka for the Cree Indians story (the "Cree Letter"),[35] and plaintiff's failure to present evidence to the contrary convince the Court that there is no genuine issue of fact regarding whether plaintiff created the photographs and text on assignment for and at the direction of NGS and whether NGS paid Ward a minimum guarantee for all of these works. A reasonable trier of fact could find only that NGS was the "motivating factor" behind creation of the works[36] and paid Ward "a sum certain for his . . . work."[37]

Likewise, there is no genuine issue of fact regarding NGS's right to direct or supervise the manner in which Mr. Ward performed his work.[38] The supervision prong is met when the employer takes the initiative in engaging the independent contractor and has the power to "'accept, reject, or modify, [his or] her work.'"[39] Letters sent to Mr. Ward by NGS demonstrate that NGS had the power to choose which of his photographs would be published in the *Magazine* and which would not, as well as the power to choose "file transparencies" to be retained for possible future use[40] -that is, the power to accept or reject his photographic work. Furthermore, a letter from an NGS representative to Ward regarding his text for the Everglades assignment demonstrates that NGS had the power to accept or reject textual material and that NGS had a practice of making significant editorial revisions to its freelance writers' work.[41]

**32.** *Playboy Enters.*, 53 F.3d at 554–55.

**33.** Defendants do not claim that Mr. Ward created the photo of John F. Kennedy in The Living White House as a work for hire. Accordingly, the Court will not take The Living White House assignment into consideration in its work-for-hire discussion below. All subsequent mention of "the works" or the "Pre–1978 Works" in this section will not include The Living White House.

**34.** Pl. 56.1 St. ¶¶ 23–29. The admissions cover the photographs and text for all of the stories except Cree Indians.

**35.** Def. Reply App. Ex. J–11.

**36.** *Playboy Enters.*, 53 F.3d at 554. Accordingly, the instance requirement is met.

**37.** *Id.* at 555. Because NGS paid a sum certain for the works, the expense prong is met whether or not NGS paid all of Ward's expenses (which appears to be the case anyway). *See id.* (expense test met as a matter of law when hiring party paid sum certain, even though independent contractor provided his own tools, worked his own hours, hired his own assistants, and paid his own taxes and benefits).

**38.** *See id.* at 554 (quoting *Picture Music, Inc. v. Bourne, Inc.*, 457 F.2d 1213, 1216 (2d Cir.), *cert denied*, 409 U.S. 997, 93 S.Ct. 320, 34 L.Ed.2d 262 (1972) (in turn quoting *Donaldson Pub. Co. v. Bregman, Vocco & Conn, Inc.*, 375 F.2d 639, 643 (2d Cir.1967), *cert. denied*, 389 U.S. 1036, 88 S.Ct. 768, 19 L.Ed.2d 823 (1968))).

**39.** *Id.* (quoting *Picture Music*, 457 F.2d at 1217).

**40.** *E.g.*, Appendix of Exhibits and Deposition Testimony in Support of Defendants' Motion for Summary Judgment ("Def.App.") Ex. B–2 (Costa Rica); *id.* Ex. D–5 (Leeward Islands); *id.* Ex. G–3 (Rhode Island); *id.* Ex. I–7 (Those Successful Japanese).

**41.** Def.App. Ex. H–2 (indicating that NGS would decide whether a manuscript was "successful" or not, advising Ward that "[he] should let the material fill to its own size, and we can cut back if necessary," and explaining that, in the event of an "unsuccessful manuscript," "we will pay a $1,500 guarantee, with the understanding that this would include a rewrite if we thought a revision could make the manuscript publishable").

The only evidence plaintiff offers to contradict NGS's supervisory power is his own statement: "National Geographic never went with me to the field to supervise my creation of the photographs. In most cases, it simply told me the subject matter of the proposed article. I was left alone to plan the coverage, make the arrangements and create the photographs." [42] While Mr. Ward's assertion is assumed to be true for purposes of this motion, *Picture Music* makes clear that lack of direct supervision during the actual creation of the work is immaterial if, as here, the hiring party took the initiative in engaging the independent contractor and had the power to accept, reject, or modify the work. [43] Thus, defendants' evidence on the supervision issue is uncontradicted.

In short, as a matter of a law, all of the Pre–1978 Works other than The Living White House were created at the instance and expense of NGS and subject to its control and supervision. Thus, a presumption arises that NGS owns the copyright in these works, and summary judgment dis-

missing the copyright claim is appropriate unless plaintiff has raised a genuine issue of fact regarding the existence of an express or implied agreement to the contrary. [44]

Turning first to the assignments predating the Cree Indians story, plaintiff does not contend that the language in any of his assignment contracts for this period expressly reserves his copyright ownership. Nor does he contend that he and NGS had an oral agreement regarding his retention of copyright ownership. Rather, Mr. Ward argues that he and NGS had a general understanding regarding copyright ownership based on industry custom that resulted in the creation of an implied-in-fact agreement confirming his ownership whenever he took on a new assignment. [45]

Under New York law, [46] "[a]n implied-in-fact contract arises in the absence of an express agreement, and is based on the conduct of the parties from which a fact-finder may infer the existence and terms of a contract." [47] Importantly for this case, an implied-in-fact contract may

---

**42.** Ward Aff. ¶ 11.

**43.** *See Picture Music,* 457 F.2d at 1216–17.

**44.** *See Playboy Enters.,* 53 F.3d at 554–55; *Brattleboro Pub. Co. v. Winmill Pub. Corp.,* 369 F.2d 565, 568 (2d Cir.1966) ("Whether the copyright resides in the person thus commissioning the work or in the independent contractor creating the work will always turn on the intention of the parties when that intent can be ascertained. Where that intent cannot be determined, the presumption of copyright ownership runs in favor of the employer." (citation and internal quotation marks omitted)).

The required evidence of a contrary agreement need not address each photograph, or even each assignment, on an individualized basis. Instead, plaintiff may create an issue of fact regarding an implied agreement that he would retain copyright ownership through evidence of a course of conduct or general understanding between him and NGS. *Cf. Playboy Enters.,* 960 F.Supp. at 714 (court may consider evidence of course of conduct to

determine whether work was made at hiring party's "instance").

**45.** Pl. Mem. 6–8.

**46.** New York law contract law applies because the parties have not argued to the Court that some other, conflicting law should be applied. *See Questrom v. Federated Dep't Stores, Inc.,* 192 F.R.D. 128, 133 & n. 26 (S.D.N.Y.2000) (absent showing of conflict, law of forum state applies), *aff'd,* 2 Fed.Appx. 81 (2d Cir.2001).

**47.** *AEB & Assocs. Design Group, Inc. v. Tonka Corp.,* 853 F.Supp. 724, 731 (S.D.N.Y.1994) (citations omitted); *see also Baltimore & Ohio R. Co. v. United States,* 261 U.S. 592, 597, 58 Ct.Cl. 709, 43 S.Ct. 425, 67 L.Ed. 816 (1923) (implied-in-fact contracts are "founded upon a meeting of minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding"); *Matter of Boice,* 226 A.D.2d 908, 910, 640 N.Y.S.2d 681, 682 (3rd Dept.1996).

be based on industry custom.[48] Ordinarily, a determination as to the existence of such an implied agreement must be made by the trier of fact by examining the manner in which the parties conducted themselves in light of ordinary industry practice.[49] However, a contract cannot be implied in fact where there is an express contract covering the subject matter involved,[50] "where the facts are inconsistent with its existence, or against the declaration of the party to be charged ... or against the intention or understanding of the parties."[51]

▮ Here, plaintiff has adduced evidence sufficient to create a genuine issue of fact regarding the existence of an implied-in-fact agreement that he would retain copyright in his work for the as-

signments predating the Cree Indians assignment. First, Ward testified in his deposition regarding the custom and practice of the magazine industry with respect to copyright during the 1960's and 1970's:

"[M]agazines would hire a project to do a project, in return for a fee, space rate or day rate, they would get one-time rights, and nothing more. And additional use meant additional pay. And this was never discussed in a phone call or letter because it was understood. I did thousands of assignments under these conditions."[52]

Generally, evidence of industry custom is probative only if both parties to the pertinent contractual dealings knew or had reason to know of it.[53] Supporting Ward's

**48.** *See Boyle v. Stephens Inc.,* No. 97 Civ. 1351(SAS), 1998 WL 690816, at *6 n. 5 (S.D.N.Y. Sept. 29, 1998), *aff'd,* 21 Fed.Appx. 76 (2d Cir.2001); *Markogianis v. Burger King Corp.,* No. 95 Civ. 4627(JFK), 1997 WL 167113, at *6 (S.D.N.Y. Apr. 8, 1997); *Brady v. Orion TV Prods., Inc.,* No. 86 Civ. 2996(KMW), 1990 WL 4002, at *3 (S.D.N.Y. Jan. 17, 1990); *Baii Banking Corp. v. Atl. Richfield Co.,* No. 86 Civ. 6651(JFK), 1987 WL 14124, at *2–3 (S.D.N.Y. Sept. 17, 1987); *McGhan v. Ebersol,* 608 F.Supp. 277, 285 (S.D.N.Y.1985); *see also Grombach Prods., Inc. v. Waring,* 293 N.Y. 609, 59 N.E.2d 425 (1944) (assuming that a contract may be implied in fact from parties' conduct in light of industry custom).

Most of the cases cited above involved claims of misappropriation or breach of an implied-in-fact agreement to pay for the submission of an idea. There is no reason to assume, however, that implied-in-fact agreements may be established by evidence of industry custom only in this narrow context. In *Baii Banking Corp.,* Judge Keenan explained the underlying contract law principles as follows:

"It is clear that a court may consider factors such as trade customs in determining whether a contract exists. The Restatement (Second) of Contracts states that, '[a] promise may be stated in words either oral or written, or may be inferred wholly or partly from conduct.' A comment to that section indicates that an intention to make a prom-

ise may be manifested by implication from other circumstances, including 'usage of trade.' Section 19 provides that assent may be manifested by words or other actions. Conduct may effectively manifest assent if the person engaging in the conduct 'knows or has reason to know that the other party may infer from his conduct that he assents.' Thus, if the defendant, a major player in the petroleum industry, had reason to know that, within the industry, the sending of the purchase confirmation to the plaintiff could create a binding agreement, the parties may have contracted."

*Baii Banking Corp.,* 1987 WL 14124, at *2 (citations omitted).

**49.** *See Brady,* 1990 WL 4002, at *3 (citing *McGhan,* 608 F.Supp. at 285).

**50.** *Julien J. Studley, Inc. v. N.Y. News, Inc.,* 70 N.Y.2d 628, 629, 518 N.Y.S.2d 779, 512 N.E.2d 300 (1987).

**51.** *Miller v. Schloss,* 218 N.Y. 400, 406–407, 113 N.E. 337 (1916).

**52.** Ward Dep. 32.

**53.** *Cf.* RESTATEMENT (SECOND) OF CONTRACTS § 19(2) (1979) (conduct may manifest assent effectively if the person engaging in the conduct "knows or has reason to know that the

testimony that his arrangement with NGS was for one-time publication rights in accordance with the custom and usage of the magazine industry is the affidavit of Robert Gilka, a former director of photography at NGS, who gave Mr. Ward his assignments between 1965 and 1978.[54] He states that through approximately 1974, NGS "was not interested in and therefore did not acquire the copyright to the works we asked freelancers like Mr. Ward to create." [55] NGS, he says, "simply wanted 'exclusive first-time rights' to publish Ward's commissioned works" and that sixty days after publication Mr. Ward was free to do whatever he wanted with the works he created "because he owned the copyright to them." [56] He states also that NGS did not pay Ward the rate it typically would have had to pay in order to obtain "all rights" to his work.[57]

Mr. Gilka's affidavit is somewhat problematic from an admissibility standpoint.[58] He is not competent to testify regarding the state of mind of NGS itself because he lacks personal knowledge regarding what NGS, to whatever extent NGS refers to anyone other than himself, "wanted" or "was interested in." In any case, NGS's state of mind is not even relevant because it is Mr. Gilka's conduct,[59] and not any unexpressed subjective intentions of his employer, that count here.[60] Moreover, his assertion that NGS "did not acquire" the copyrights in certain works is an inadmissible legal conclusion. However, all of these statements fairly may be construed as evidence of the same industry custom Mr. Ward referred to above and of Mr. Gilka's knowledge thereof.[61] Moreover, the first two quoted statements are evidence Mr. Gilka's own state of mind when it came to his contractual dealings with Mr. Ward. While Mr. Gilka's state of mind itself is not relevant,[62] evidence of his state of mind would be admissible to establish that he acted in a manner consistent with it during his dealings with Mr. Ward. Finally, the statement regarding the level of compensation paid to Mr. Ward bears on precisely the type of nonverbal conduct upon which an implied-in-fact contract may be based. Mr. Ward's deposition testimony and Mr. Gilka's affidavit, if credited, would tend to prove that the parties went about their contractual dealings against a

---

other party may infer from his conduct that he assents"); *id.* §§ 220, 221 (custom and usage may be used to interpret or supplement an express agreement when each party knows or has reason to know of the usage and neither party knows or has reason to know that the other party has an intention inconsistent with the usage).

**54.** Gilka Aff. ¶¶ 3–4.

**55.** *Id.* ¶ 8.

**56.** *Id.* at ¶ 9.

**57.** *Id.* ¶ 10.

**58.** Only admissible evidence may be considered in passing on motions for summary judgment. *Evans v. Port Authority,* 192 F.Supp.2d 247, 262 & n. 16 (S.D.N.Y.2002) (citing cases).

**59.** Mr. Gilka acted as NGS's agent in its contractual relations with Mr. Ward, and no one disputes that he had the authority to bind the company. Thus, if an implied-in-fact contract arose, it was through the conduct of Mr. Gilka and Mr. Ward.

**60.** *Hotchkiss v. Nat'l City Bank,* 200 F. 287, 293 (S.D.N.Y.1911), *aff'd,* 201 F. 664 (2d Cir. 1912), *aff'd,* 231 U.S. 50, 34 S.Ct. 20, 58 L.Ed. 115 (1913).

**61.** Although defendants have offered considerable evidence undercutting Mr. Gilka's credibility on this point, *see, e.g.,* Def. Reply App. Exs. J–4, J–7, it is axiomatic that delicate assessments of credibility are not proper on a motion for summary judgment. *See Hayes v. New York City Dept. of Corrections,* 84 F.3d 614, 619 (2d Cir.1996) (citing *United States v. Rem,* 38 F.3d 634, 644 (2d Cir.1994)).

**62.** *See Hotchkiss,* 200 F. at 293.

backdrop of industry custom establishing that the default rule was one-time publication rights and that the parties tacitly agreed to follow that custom.

Finally, plaintiff has produced evidence showing that NGS repeatedly paid Mr. Ward for reusing his work.[63] A reasonable trier of fact might consider it strange that NGS would pay Mr. Ward to reuse works that it already owned.[64] While defendants have adduced evidence that NGS's policy of payment for further use was purely voluntary,[65] their efforts merely highlight the presence of a genuine issue of fact in this area.

Taken together, Mr. Gilka's affidavit, Mr. Ward's deposition testimony, and plaintiff's documentary evidence regarding payment for reuse create a genuine issue of fact regarding whether or not Messrs. Ward and Gilka implicitly agreed that Ward would retain copyright ownership of his photos and/or texts for the Costa Rica, Singing Birds, National Parks/ Parkscape

USA, Leeward Islands, Sharks, Rhode Island, Everglades, and Those Successful Japanese projects. Summary judgment dismissing plaintiff's infringement claims with respect to these assignments is denied.

■ The situation is altogether different for the Cree Indians assignment. The Cree Letter, dated June 13, 1973, expressly states that NGS "will retain all rights to photographs ... publish[ed] in the Cree Indians article."[66] Plaintiff therefore cannot establish an implied-in-fact agreement that he would retain copyright because the "prerequisite for such a contract is that there be no express agreement dealing with the same subject matter."[67]

Even putting that principle aside, the evidence would not create a genuine issue of fact. When confronted with the Cree letter, Mr. Gilka acknowledged that it was "at that time," starting in June 1973, that NGS imposed upon its freelance photographers the "custom" of retaining all rights to published photographs.[68] This admis-

---

**63.** *E.g.,* Pl. Supp. Summary Judgment Ex. 7 (payment for reuse of photo from Everglades story); *id.* Ex. 8 (letter requesting "permission" and making payment for reuse of photo from Costa Rica story); *id.* Ex. 9 (payment for reuse of photo previously published in Everglades filmstrip, stating "[i]t is understood that you represent ownership of the rights herein granted").

**64.** *Cf. Playboy Enters., Inc. v. Dumas,* 831 F.Supp. 295, 312 (S.D.N.Y.1993) ("An assignment would not make sense if the parties presumed that Playboy would be the author of the work for statutory purposes."), *aff'd in part and rev'd in part on other grounds,* 53 F.3d 549 (2d Cir.), *cert. denied,* 516 U.S. 1010, 116 S.Ct. 567, 133 L.Ed.2d 491 (1995).

**65.** *E.g.,* Allen Decl. ¶ 5.

**66.** Def. Reply App. Ex. J–11. The Court is aware that language granting "all rights" does not necessarily or unambiguously transfer copyright ownership. *See Playboy Enters.,* 831 F.Supp. at 305. However, it must be remembered that defendants here enjoy the presumption resulting from their satisfaction

of the instance, expense, and supervision requirements. There is absolutely no ambiguity in the retention of "all rights" by NGS when it comes to deciding whether there was an express or implied agreement reserving copyright to Ward.

**67.** *Allstate Ins. Co. v. Administratia Asigurarilor De Stat,* 948 F.Supp. 285, 310 (S.D.N.Y. 1996).

**68.** Affidavit of Robert E. Gilka in Opposition to Defendants' Motion for Summary Judgment ("Gilka Opp. Aff.") ¶¶ 12–13; *see also id.* ¶ 15 ("I changed that policy [i.e., the policy of not seeking copyright ownership for NGS] with respect to Mr. Ward with my "Cree Indians" letter, but not before.").

Although there is no testimony in Mr. Ward's deposition that deals directly with the Cree Indians letter, he did speak about his reaction to the "all rights" language in a December 21, 1976 letter regarding the "Diamonds" assignment. Ward claims that he called Mr. Gilka and complained, saying that the policy was "contrary to industry standard." Ward Dep. 51–52. Ward went on to say that Mr. Gilka

sion deflates the probative value of plaintiff's evidence regarding industry custom. Finally, plaintiff produced no documentary evidence demonstrating that NGS ever paid Mr. Ward for reuse of the Cree Indians material. In sum, the major strands of evidence proffered by plaintiff to demonstrate a factual dispute with respect to the other assignments do not avail him when it comes to the Cree Indians assignment.

For the foregoing reasons, there is no genuine issue of fact regarding an agreement reserving copyright to Ward for the Cree Indians assignment, and NGS is entitled to judgment as a matter of law dismissing the copyright infringement claim with respect to that assignment.

### B. License to Publish Photographs and Texts in the Magazine

■ Defendants argue also that they would be entitled to summary judgment, even if the Pre–1978 Works were not works for hire, because Mr. Ward granted NGS licenses encompassing the creation and distribution of The Complete National Geographic.[69]

Divining the exact scope of each agreement between Mr. Ward and NGS is virtually impossible at this point in the litigation. As stated above, there is no written memorialization of terms for many of the assignments. Even for those assignments for which there is a writing, the language and its circumstances present anything but a picture of clarity.[70]

Defendants attempt to sidestep these problems by making what superficially appears to be an ingenious argument. They argue that, at the very least, Mr. Ward granted NGS a license to publish his work in the Magazine and that NGS has not acted outside the scope of that original license because The Complete National Geographic is "nothing more than an exact image-based reproduction of the Magazine in electronic format." [71] Defendants' argument fails as a matter of law, however, because, under the 1909 Act, NGS had no right to sublicense any rights it might have obtained from Mr. Ward unless he expressly permitted NGS to do so.

Under the 1909 Act,[72] "[a] licensee . . . had no right to sell or sublicense the rights acquired unless he had been expressly authorized so to do." [73] The rule appears to

---

assured him that he would retain access to his pictures at all times and, but that NGS wanted to hold the photographs for safe-keeping in a dry and cool place. *Id.* at 52. When pressed about the specifics of this conversation, Mr. Ward admitted that "[c]opyright was never mentioned" and that "[i]t was never mentioned in any conversation during this time frame." *Id.* at 53. Because of the presumption of ownership resulting from NGS's satisfaction of the instance, expense, and control elements, Ward's insistence that he was silent with respect to copyright ownership undermines any factual issue he might have been able to raise through his objection to the "all rights" language.

**69.** Def. Mem. 17.

**70.** Defendants claim that the language of a letter from NGS to Mr. Ward, dated September 16, 1968, gave NGS an "unlimited license" to reproduce the Rhode Island photo-

graphs. *Id.* at 18–19; *see also* Def.App. Ex. G–3. However, there is a genuine issue of fact regarding exactly which photographs were returned with this letter.

**71.** Def. Mem. 19–20.

**72.** The 1909, rather than the 1976, Act applies to the sublicensing issue because any license plaintiff granted to NGS to publish the works was granted prior to January 1, 1978. *See Playboy Enters.*, 831 F.Supp. at 301 (choice of law between 1976 Act and 1909 Act depends "on whether the works in question were created or allegedly transferred subsequent to January 1, 1978").

**73.** 3 Nimmer § 10.01[C][4], at 10–18; *accord Harris v. Emus Records Corp.*, 734 F.2d 1329, 1333–34 (9th Cir.1984); *Neva, Inc. v. Christian Duplications Int'l, Inc.*, 743 F.Supp. 1533, 1546 (M.D.Fla.1990); *Ilyin v. Avon*

derive from two sources. First, a line of patent cases has enunciated the federal interest in guaranteeing an owner of intellectual property the right to control the identity of his or her licensees in order to monitor the use of his or her property.[74] Second, because of the indivisibility doctrine under the 1909 Act, a copyright licensee under that Act effectively had no property interest to transfer.[75]

Both rationales are persuasive. Despite efforts over the years by courts to ameliorate the sometimes harsh results dictated by the doctrine of indivisibility,[76] its applicability to the realm of assignments and licenses remains unquestioned.[77] Given this doctrine, it is difficult to see how a license under the 1909 Act has anything other than a personal right. Moreover,

the Court agrees with the Ninth Circuit that "there are strong policy reasons to place the burden on the licensee to get the licensor's explicit consent either during or after contract negotiations."[78] Most notably, adopting a different rule might unduly undercut the economic incentives enjoyed by owners and creators of copyrightable material.[79] By licensing rather than assigning his or her interest in a copyright, a copyright owner reserves certain rights, including that of collecting royalties. The owner's ability to monitor use would be jeopardized by allowing sublicensing without notice.[80] Furthermore, copyright owners who grant nonexclusive licenses might find themselves involuntarily competing with their own licensees for future licensing opportunities if sublicens-

---

*Publ'ns, Inc.,* 144 F.Supp. 368, 372 (S.D.N.Y. 1956); *Mills Music v. Cromwell Music,* 126 F.Supp. 54, 62 (S.D.N.Y.1954); *see also Gardner v. Nike, Inc.,* 279 F.3d 774 (9th Cir.2002) (relying on the 1909 Act rule to determine, under the 1976 Act, that a copyright licensee may not transfer its rights under an exclusive license without the express consent of the original licensor).

**74.** *See Hapgood v. Hewitt,* 119 U.S. 226, 233–34, 7 S.Ct. 193, 30 L.Ed. 369 (1886); *Troy Iron & Nail Factory v. Corning,* 55 U.S. 193, 216, 14 How. 193, 14 L.Ed. 383 (1852); *Everex Sys., Inc. v. Cadtrak Corp.* (*In re CFLC, Inc.*), 89 F.3d 673, 679 (9th Cir.1996); *Harris,* 734 F.2d at 1333–34; *Unarco Indus., Inc. v. Kelley Co.,* 465 F.2d 1303, 1305–06 (7th Cir. 1972), *cert. denied,* 410 U.S. 929, 93 S.Ct. 1365, 35 L.Ed.2d 590 (1973).

**75.** *See Gardner,* 279 F.3d at 778; *see also Gardner v. Nike,* Inc., 110 F.Supp.2d 1282, 1285 (C.D.Cal.2000), *aff'd,* 279 F.3d 774 (9th Cir.2002).

**76.** *E.g., Goodis v. United Artists Television, Inc.,* 425 F.2d 397 (2d Cir.1970) (avoiding harsh results from combination of indivisibility doctrine and notice requirements under the 1909 Act).

**77.** *See id.* at 400 (noting that the policy for applying the indivisibility rule is "to avoid

multiple infringement actions, each brought by the holder of a particular right in a literary work without joining as co-plaintiff the author or proprietor of the copyrighted work").

**78.** *Gardner,* 279 F.3d at 781.

**79.** The Court is aware that United States copyright law does not promote the rights and incentives of copyright owners and creators at all costs, but rather seeks to strike a delicate balance between an economic incentive for creators and public access to works and ideas. *See, e.g., Sony Corp. v. Universal City Studios, Inc.,* 464 U.S. 417, 429, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984); *Computer Assocs. Int'l, Inc. v. Altai, Inc.,* 982 F.2d 693, 696 (2d Cir.1992). If this balance is to be maintained, the economic incentives of creators and owners cannot be disregarded.

**80.** *Gardner,* 279 F.3d at 778 (citing *Harris,* 734 F.2d at 1334). The Ninth Circuit commented further: "It is easy to imagine the troublesome and potentially litigious situations that could arise from allowing the original licensor to be excluded from negotiations with a sublicensee. For example, what if the sublicensee was on the verge of bankruptcy or what if the original licensor did not agree that the sublicensee's ... use of the copyright fell within the original exclusive license?" *Id.* at 781.

ing were permitted without permission.[81] Finally, imposing the responsibility for obtaining permission on the licensee would not unduly impede economic exploitation of, nor public access to, copyrighted materials. Indeed, in cases such as this one, the licensee undeniably enjoys greater bargaining power than the putative copyright owner. All in all, requiring a licensee to get explicit consent from his or her licensor strikes an appropriate balance between economic incentives and public access.[82]

Defendants do not dispute that NGS licensed the rights to reproduce and distribute the *Magazine* to its for-profit affiliate, NGV, which, through NGE and NGI, in turn licensed Mindscape[83] to reproduce and distribute products based on the archive of the *Magazine*.[84] Defendants not unreasonably argue that NGS should not "ha[ve] to create its own CD–ROM manufacturing arm in order to reproduce its own magazine in CD–ROM format."[85] So the Court would hesitate to apply the rule against sublicensing under the 1909 Act if NGS merely had hired Mindscape to create the product for NGS and had licensed Mindscape to facilitate actions taken pursuant to that "employment" relationship. The economic reality here, however, is that NGI granted Mindscape rights in return for royalties on all sales,[86] making this a classic licensing arrangement. Defendants overstate the situation when they claim NGS had to go to these lengths "in order to reproduce its own magazine in CD–ROM format."[87]

Defendants vigorously invoke also the distinction between the *Magazine* as a collective work and Mr. Ward's individual contributions. They argue that NGS had the right to license what it owned—that is, the collective work—and that NGS "never licensed the use of Plaintiff's works on an individual disaggregated basis."[88] This point, however, begs the question. When Mindscape made and sold The Complete National Geographic, it reproduced and distributed copies of Mr. Ward's individual contributions as well as the features peculiar to the collective work. Defendants cannot simultaneously claim a license to use Mr. Ward's individual contributions and claim that Mindscape, which actually carried out the project, was licensed only with respect to the collective work. One or the other of them exceeded the scope of its respective license. In either case, the plaintiff's rights, if in fact he had any, were infringed.

In sum, there is no indication that Mr. Ward expressly authorized NGS to sublicense whatever rights it might have obtained to publish his work. Defendants therefore cannot rely on a license defense to the infringement claim because production and distribution of The Complete National Geographic occurred through a series of sublicensing arrangements. Thus, defendants are not entitled to summary judgment on this ground.

## C. Refusal of Registration

■ Finally, defendants seek summary judgment dismissing the infringement

---

81. *See In re CFLC, Inc.,* 89 F.3d at 679.

82. *Gardner,* 279 F.3d at 778.

83. Because of this subsequent sublicense to Mindscape, the Court need not reach the question of whether NGS's sublicense to its own affiliate triggers the 1909 Act rule against sublicensing absent express authorization.

84. Fahey Decl. Ex. B ¶¶ 1, 2.

85. Def. Reply Mem. 8.

86. *Compare* Pl. 56.1 St. ¶ 17, *with* Def. 56.1 St. ¶ 17.

87. Def. Reply Mem. 8.

88. *Id.* at 7–8.

claims on the ground that the Copyright Office [89] denied registration to the photographs in the Those Successful Japanese story [90] because Mr. Ward did not provide documentation that the Those Successful Japanese photographs were published with a copyright notice in his name.[91] The examiner explained in a letter to Mr. Ward that, under the 1909 Act, copyright notice required, *inter alia,* the name of the copyright owner or proprietor and that registration could be made only by the person or entity whose name appeared in the notice. As the only name in the copyright notice was that of NGS, only NGS could register the work.[92]

Defendants' initial argument—that plaintiff's sole remedy in the face of denial is to seek a writ of mandamus against the Register of Copyrights—is untenable in the face of Section 411(a) of the 1976 Act,[93] and defendants concede as much in their reply papers.[94] Plaintiff served the Register of Copyrights with notice and a copy of the complaint,[95] and there is no dispute regarding other filing formalities. Thus, the Court has jurisdiction to hear this infringement suit.

█ Furthermore, contrary to defendant's suggestion,[96] the plaintiff need not demonstrate that the Copyright Office's

---

**89.** The terms "Copyright Office" and "Register of Copyrights" are used interchangeably throughout this section.

**90.** *See* Def. Mem. 9–10. The Copyright Office also refused to register the Cree Indians material, but the Court already has disposed of plaintiff's infringement claim with respect to that material.

**91.** Def.App. Ex. A–3.

**92.** *Id.*

**93.** *See* 17 U.S.C. § 411(a); *Atari Games Corp. v. Oman,* 888 F.2d 878, 880–81 (D.C.Cir. 1989); *Nova Stylings, Inc. v. Ladd,* 695 F.2d 1179, 1181 (9th Cir.1983); *Esquire, Inc. v. Ringer,* 591 F.2d 796, 806 n. 28 (D.C.Cir. 1978), *cert. denied,* 440 U.S. 908, 99 S.Ct. 1217, 59 L.Ed.2d 456 (1979).
Section 411(a) of the 1976 Act applies here because the alleged acts of infringement occurred after January 1, 1978. *See Foote v. Franklin,* 1998 WL 970179, 49 U.S.P.Q.2d 1523, 1526 n. 3 (N.D.Tex.1998).
To the extent *Ernst Haas Studio, Inc. v. Palm Press, Inc.,* No. 96 Civ. 3811, 1997 WL 566151 (S.D.N.Y. Sept. 11, 1997), *aff'd,* 164 F.3d 110 (2d Cir.1999), and *Techniques, Inc. v. Rohn,* 592 F.Supp. 1195 (S.D.N.Y.1984), stand for the proposition that mandamus is required, the Court respectfully declines to follow them. The cases relied upon by the *Ernst Haas* court for the proposition that mandamus is the only remedy for denial of registration were decided under the 1909 Act with the exception of *Techniques* and therefore are inapposite. *Ernst Haas,* moreover, seems internally inconsistent, saying at one point that a mandamus action is the sole remedy and at another that "a jurisdictional prerequisite for a copyright infringement action is obtaining or being denied a certificate of registration from the Copyright Office." 1997 WL 566151, at *2. *Techniques,* although decided under the 1976 Act, mistakenly cited *Esquire* for the proposition that mandamus required under the 1976 Act, when in fact *Esquire* said that (a) mandamus remains available, not indispensable, under the new statute, and (b) registerability could be decided in an infringement suit. *See* 591 F.2d at 806 n. 28. *Ernst Haas* and *Techniques,* moreover, are directly contradicted by the 1976 Act's legislative history, *see* H. REP. No. 94–1476, at 157 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5773, as the *Esquire* court noted. 591 F.2d at 806 n. 28. Furthermore, the Second Circuit's affirmance of *Ernst Haas* did not denote approval of its holding regarding mandamus, as the appellate court expressly declined to address the merits because the appellant failed to make reasoned legal arguments in its brief. *See Ernst Haas,* 164 F.3d at 112.

**94.** *See* Def. Reply Mem. 4–5 (acknowledging that the 1976 Act provides for judicial review, but arguing for abuse of discretion standard of review).

**95.** Pl. Supp. Summary Judgment Ex. 14.

**96.** Def. Reply Mem. 4 ("Plaintiff, however, makes no effort to make the showing he must make in order to proceed, *i.e.,* that the Register abused her discretion in denying his application for registration.").

denial of registration was erroneous in order to survive the defendants' motion for summary judgment on the infringement claim, as the district court makes an independent determination of copyright ownership when the plaintiff sues under Section 411(a), just as in any other infringement action. The Copyright Office's refusal to register a work at most deprives the plaintiff in such an action of Section 410(c)'s presumption of validity,[97] which is not conclusive on the district court in any case.[98] While the parties cited no cases directly on point and the Court located no direct and explicit holdings on this issue, the conclusion that district courts must make independent determinations of copyright validity in Section 411(a) infringement actions is supported by the structure of the 1976 Act and is implicit in the case law.

The 1976 Act provides two options for a person whose registration application has been denied by the Copyright Office. First, an applicant may invoke Section 701(e)[99] and commence suit against the Register of Copyrights in an effort to overturn the determination. The sole issue in such an action would be the propriety of the denial of registration, and the district court's standard of review would be deferential—the agency action would be set aside only if found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[100] In substance, a Section 701(e) action would be similar to a mandamus action under the 1909 Act, only grounded on Section 701(e) and the Administrative Procedure Act rather than the Mandamus and Venue Act of 1962.

The second option available to an applicant, provided there is an alleged infringement, is to serve the Register of Copyrights with appropriate notice and "institute an action for infringement" under Section 411(a).[101] The plain meaning of the words "action for infringement" indicates that all issues typically raised in an infringement suit, including ownership and validity, are open in a Section 411(a) suit. Section 411(a)'s provision for permissive intervention by the Register of Copyrights on the "issue of registerability" confirms this conclusion because it makes clear that the scope of the "infringement action" goes beyond registerability. The language of the House Report accompanying the 1976 Act further reinforces this conclusion: "The Register is authorized, though not required, to enter the suit within 60 days; the Register would be a party on the issue of registerability *only*, and a failure by the Register to join the action would 'not deprive the court of jurisdiction to determine that issue.'"[102] Furthermore, given that Section 701(e) already provides a route for dealing with the specific issue of registerability, and that the Copyright Office undeniably is the party best suited to defending its own decisions, limiting Section 411(a) actions against third-party infring-

---

97. 17 U.S.C. § 410(c).

98. *Carol Barnhart Inc. v. Economy Cover Corp.*, 773 F.2d 411, 414 (2d Cir.1985).

99. 17 U.S.C. § 701(e).

100. 5 U.S.C. § 706(2)(A); *see, e.g., OddzOn Prods., Inc. v. Oman*, 924 F.2d 346 (D.C.Cir. 1991); *Atari Games Corp. v. Oman*, 888 F.2d 878 (D.C.Cir.1989); *Homer Laughlin China Co. v. Oman*, Civ. A. No. 90–3160, 1991 WL 154540 (D.D.C. July 31, 1991); *Jon Woods*

*Fashions, Inc. v. Curran*, No. 85 Civ. 3203(MJL), 1988 WL 38585 (S.D.N.Y. Apr. 19, 1988); *see also* Laurie A. Haynie, *So the Copyright Office Has Refused to Register Your Claim to Copyright—What Does It Means and What Can You Do About It?*, 21 AIPLA Q.J. 70, 77–86 (1992) (collecting cases).

101. 17 U.S.C. § 411(a).

102. H. REP. NO. 94–1476, at 157 (emphasis added).

ers to the registration issue would make Section 411(a) superfluous and misguided.

The case law implicitly supports the conclusion that a district court resolves the full panoply of copyright infringement issues in a suit under Section 411(a), regardless of the propriety of a denial of registration, although direct statements on this topic typically come in *dicta* in cases in which plaintiffs proceeded directly against the Copyright Office. For example, in *OddzOn Products, Inc. v. Oman*,[103] then Circuit Judge Ruth Bader Ginsburg explained:

> "In conclusion, we again emphasize that we decide simply and only that the refusal of the Copyright Office to register the KOOSH ball, in the circumstances here presented, does not constitute an abuse of discretion. We do not decide on the copyrightability of the item, and we intimate no opinion on the decision we would reach if the matter came before us in an infringement action." [104]

In his concurrence in *Atari Games Corp. v. Oman*,[105] Judge Silberman expounded on the distinction between review of a denial of registration and an ultimate determination of the copyright validity. His comments are worth quoting:

> "We must bear in mind that when we review the Register's determination to accept or reject an application for registration, we do not make a final decision on the copyrightability of an item. In fact, as the majority opinion recognizes,

the Copyright Office's imprimatur is worth only a rebuttable presumption as to copyrightability in an infringement action. And as the government points out, the Copyright Office receives over a 100,000 applications every year. Every time the Register denies registration for too little creativity it cannot be expected to issue an opinion that compares with the learned offerings of my colleagues. I think that is why the courts have generally thought abuse of discretion to be the appropriate standard to review the Office's denial of registration. Since the applicant can gain *full judicial review of copyrightability* in an infringement action, the costs of forcing too fine an analysis and too extensive an explanation of a denial of registration are not worth the benefits—particularly when reviewing a question which has unavoidably subjective aspects such as how much creativity is sufficient to force the Copyright Office to register a proffered work." [106]

Thus, a court's role in the Section 701(e) context is much more limited than under Section 411(a).

Courts have been less explicit on this point in infringement suits under Section 411(a), but the cases lead to the same conclusion. Courts in Section 411(a) cases typically have determined copyright validity independently and not confined themselves to the propriety of the Copyright Office's denial of registration.[107] For ex-

---

103. 924 F.2d 346 (D.C.Cir.1991).

104. *Id.* at 350.

105. 888 F.2d 878 (D.C.Cir.1989).

106. *Id.* at 887 (Silberman, J., concurring) (emphasis in original); *see also Nova Stylings, Inc. v. Ladd*, 695 F.2d 1179, 1181 (9th Cir. 1983) ("Once [notice is served on the Register], the district court can determine both the validity of the copyright, which in turn determines its registerability, as well as whether an infringement has occurred.").

107. The matter is complicated, however, by the fact that in many cases the denial of registration is grounded on lack of copyrightable subject matter, resulting in substantial overlap between the court's analysis of copyright validity and the Copyright Office's analysis regarding registerability. *E.g., John Muller & Co. v. N.Y. Arrows Soccer Team, Inc.*, 802 F.2d 989 (8th Cir.1986); *Safeguard Bus. Sys., Inc. v. Reynolds & Reynolds Co.*, 1990 WL 39259, 14 U.S.P.Q.2d 1829 (E.D.Pa. Mar. 30, 1990), *aff'd without opinion*, 919 F.2d 136 (3d Cir.1990); *Gemveto Jewelry Co. v. Jeff*

ample, in *Foote v. Franklin Mint*,[108] the plaintiff brought an infringement action under Section 411(a) after the Copyright Office denied registration of his work, "Tridimensional Chess," on the ground that it had been published in a periodical without its own copyright notice.[109] After acknowledging that Section 411(a) allows an applicant to institute an infringement suit after serving a copy of the complaint on the Copyright Office,[110] the court independently analyzed whether the plaintiff "possessed a valid copyright to the Work."[111] Specifically, the court considered whether the author had injected the work into the public domain by publishing it without its own notice or whether the *Goodis* exception to the indivisibility doc-

trine applied in the circumstances.[112] It made no mention of the Copyright Office's determination in its legal analysis.[113] Other Section 411(a) cases follow the same pattern.[114]

Finally, the facts of this case illustrate the anomaly that would result if district courts were limited in Section 411(a) actions strictly to the issue of registerability. As noted above, in most cases the issues of registerability and copyright ownership overlap, so the distinction is mostly academic. Here, however, the Copyright Office denied registration because plaintiff was not the proper person to register a claim to copyright for the photographs, not because plaintiff did not have a valid and protectible copyright interest in the photo-

*Cooper Inc.*, 568 F.Supp. 319 (S.D.N.Y.1983), *vacated on other grounds*, 800 F.2d 256 (Fed. Cir.1986); *Norris Indus., Inc. v. Int'l Tel. & Tel. Corp.*, No. TCA 80–1027, 1981 WL 1378 (N.D.Fla. Aug. 12, 1981), *aff'd*, 696 F.2d 918 (11th Cir.), *cert. denied*, 464 U.S. 818, 104 S.Ct. 78, 78 L.Ed.2d 89 (1983).

Making matters worse, some courts in Section 411(a) cases apply an "abuse of discretion" standard to the Register's determination of copyrightability. *E.g., N.Y. Arrows Soccer Team*, 802 F.2d at 990; *Safeguard Bus. Sys., Inc.*, 1990 WL 39259, 14 U.S.P.Q.2d at 1832–33; *Gemveto Jewelry*, 568 F.Supp. at 329–30; *Norris Indus., Inc.*, 1981 WL 1378, at *1. As a result, often it is difficult to discern whether a court is reviewing solely the propriety of registration denial or the broader issue of copyrightability. *E.g., Norris Indus., Inc.*, 1981 WL 1378, at *1–3; *Gemveto*, 568 F.Supp. at 329–31.

It is not necessary to determine what standard of review applies to the Copyright Office's denial of registration in this case because the plaintiff has not asked this Court to compel registration and, as noted below in greater detail, the notice defect pointed out by the Copyright Office will have no bearing on the ultimate determination of copyright ownership, which requires resolution by the trier of fact. However, the Court agrees with Judge Silberman that, in an infringement action under Section 411(a), the "judicial review of questions of law, including the question of copyrightability, is entirely *de novo*."

*Atari Games Corp.*, 888 F.2d at 887 (Silberman, J., concurring).

**108.** 1998 WL 970179, 49 U.S.P.Q.2d 1523 (N.D.Tex.1998).

**109.** *See id.* at 1524–25. The facts of *Foote* are thus substantially similar to the facts of this case.

**110.** *See id.* at 1526.

**111.** *Id.*

**112.** *See id.* at 1527–28.

**113.** *See also Brandir Int'l, Inc. v. Cascade Pac. Lumber Co.*, 834 F.2d 1142 (2d Cir.1987).

**114.** *E.g., Norris Indus., Inc. v. Int'l Tel. & Tel. Corp.*, 696 F.2d 918, 921–22 (11th Cir.) (framing the issue on appeal as whether "the district court was correct in deciding that the wire-spoked wheel covers are useful within the meaning of the copyright law," despite discussion of proper deference to Copyright Office), *cert. denied*, 464 U.S. 818, 104 S.Ct. 78, 78 L.Ed.2d 89 (1983); *Safeguard Bus. Sys. Inc.*, 14 U.S.P.Q.2d at 1832 (treating issue of copyrightability *de novo* and stating that "[t]he conclusion that these day sheets are not subject to copyright is reinforced by the Register's rejection of Safeguard's copyright application").

graphs.[115] Indeed, if the Copyright Office had so determined, its decision would be infected by an erroneous view of the law in light of *Goodis v. United Artists Television, Inc.*,[116] under which NGS's copyright notice for the entire issue of the *Magazine* in certain circumstances would be sufficient to secure copyright protection for plaintiff for his individual contribution.[117] Furthermore, if plaintiff satisfied the factual predicates to application of the *Goodis* rule, he would be entitled to renewal registration, assuming the correctness of the Ninth Circuit's decision in *Abend v. MCA, Inc.*[118] Thus, if this Court could not determine the issue of copyright ownership independently, the plaintiff might have a valid and protectible copyright interest, yet be unable successfully to protect that interest because of a problem relating solely to registration formalities. It is inconceivable that Congress intended simultaneously to grant applicants the right to institute an infringement action despite refusal of registration and to allow defects relating solely to registration to defeat these same infringement actions when an applicant potentially possesses a valid copyright.

In sum, this Court is required to determine independently whether plaintiff owns valid copyrights in the works at issue. The notice issue raised by the Copyright Office is not relevant to that ultimate determination of copyright ownership here. If the trier of fact determines that the plaintiff granted NGS only the right of first publication, then the *Goodis* rule may shelter him.[119] Alternatively, if the trier of fact determines that plaintiff created the photographs as works for hire, the notice issue will be irrelevant, and plaintiff will lose. Accordingly, summary judgment for the defendants based on the Copyright Office's denial of registration is not appropriate.

## D. The Living White House

 Defendants concede that Mr. Ward's photograph of John F. Kennedy in the Oval Office, published in The Living White House story, was not created as a work for hire. There is no dispute regarding plaintiff's ownership of a valid copyright in the photograph. Nor is there any dispute regarding infringement. The defendants' license-based defense fails as a matter of law. Accordingly, there is no genuine issue of material fact regarding the Living White House story, and plaintiff is entitled to judgment as a matter of law

**115.** As noted above, The Copyright Office representative stated as its reason for denial that "a claim to copyright must have been registered in the name appearing in the notice." Def.App. Ex. A–3.

**116.** 425 F.2d 397 (2d Cir.1970).

**117.** *Id.* at 399; *see also Sanga Music, Inc. v. EMI Blackwood Music, Inc.*, 55 F.3d 756, 760 (2d Cir.1995) (reaffirming *Goodis* ). The *Goodis* court held that "where a magazine has purchased the right of first publication under circumstances which show that the author has no intention to donate his work to the public, copyright notice in the magazine's name is sufficient to obtain a valid copyright on behalf of the beneficial owner, the author or proprietor." *Goodis*, 425 F.2d at 399.

Thus, the factual predicate for application of the *Goodis* rule are that (a) the magazine purchased only first-publication rights, and (b) the plaintiff did not show an intention to donate his work to the public. There is a genuine issue of fact regarding whether or not NGS bought first-publication rights or whether plaintiff created his photographs and texts as works for hire.

**118.** 863 F.2d 1465, 1469–72 (9th Cir.1988), *aff'd sub nom. Stewart v. Abend*, 495 U.S. 207, 110 S.Ct. 1750, 109 L.Ed.2d 184 (1990) (not reaching the *Goodis* issue).

**119.** *See Goodis*, 425 F.2d at 399. There appears to be no dispute that plaintiff did not intend to donate his work to the public. *See id.*

as to liability with respect to this photograph.[120]

### III. Digital Millennium Copyright Act

█ Plaintiff claims also that defendants violated Section 1202(a) of the 1976 Act, as added by the DMCA, by providing false copyright management information.[121] Mr. Ward bases this claim on the fact that each page printed from The Complete National Geographic contains NGS's copyright notice.[122] He contends that NGS's addition of its own copyright notice to printed pages amounts to the provision of false copyright management information because he, and not NGS, owns the copyrights in his individual contributions to the *Magazine*.

Section 1202(a) "establishes a general prohibition against intentionally providing false copyright management information . . ., and against distributing or importing for distribution false copyright management information."[123] Although there is a dearth of case law applying this recently enacted statute, the legislative history provides clear guidelines:

> "There are two prerequisites that must be met for these prohibitions to be violated: (1) the person providing, distributing or importing the false [copyright management information] must know the [copyright management information] is false, and (2) the person providing, distributing, or importing the false [copyright management information] must do so with the intent to induce, enable, facilitate or conceal an infringement of any right under title 17."[124]

**120.** A district court may grant summary judgment *sua sponte* against a moving party, so long as the losing party was on notice that he or she had to come forward with all of his or her evidence. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 326, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The practice is discouraged in the Second Circuit, however, and grants of summary judgment without notice "will be tolerated only in the absence of 'some indication that the moving party might otherwise bring forward evidence that would affect the . . . determination,' when 'the facts before the district court were fully developed so that the moving party suffered no procedural prejudice.' " *Bridgeway Corp. v. Citibank*, 201 F.3d 134, 139 (2d Cir.2000) (quoting *Coach Leatherware Co. v. AnnTaylor, Inc.*, 933 F.2d 162, 167 (2d Cir.1991)). Here, the issue is identical to that raised in defendants' motion papers, and it previously was raised in plaintiff's cross-motion for summary judgment. Accordingly, there is no suggestion that defendants have any other evidence to offer, and treating plaintiff as having moved for partial summary judgment on the issue of liability with respect to this work will cause no prejudice. *See id.* at 139–40. In short, this is an appropriate situation in which to grant summary judgment against the moving party.

**121.** Although defendants perceive some ambiguity in the complaint and address both subsections (a) and (b) of Section 1202 in their memorandum of law, *see* Def. Mem. 22, plaintiff relies only on Section 1202(a), *see* Plaintiff's Memorandum of Law in Support of Motion for Summary Judgment ("Pl. Mem. Supp. Summary Judgment") 19.

Section 1202(a) provides that "[n]o person shall knowingly and with intent to induce, enable, facilitate, or conceal infringement (1) provide copyright management information that is false, or (2) distribute or import for distribution copyright management information that is false." 17 U.S.C. § 1202(a). " 'Copyright management information' principally includes the title of the work, name of the author and copyright owner, and information set forth in the copyright notice." Neil Weinstock Netanel, *From the Dead Sea Scrolls to the Digital Millennium: Recent Developments in Copyright Law*, 9 Tex. Intell. Prop L.J. 19, 25 (2000); *see also* 17 U.S.C. § 1202(c).

**122.** Especially upsetting to Mr. Ward are those pages which contain nothing but one of his photographs and the NGS copyright notice. *E.g.* Pl. Supp. Summary Judgment Ex. 15.

**123.** S. REP. NO. 105–190, at 34 (1998).

**124.** *Id.* at 34–35.

In this case, plaintiff, who would have the burden at trial, has failed to adduce evidence which, if credited, would justify a finding that defendants knew NGS's copyright notice was false when placed in proximity to plaintiff's photographs and texts.

Plaintiff argues that NGS "possessed documents that gave it no authority to publish what it did, even if it never read them." [125] He points in particular to a letter that accompanied the return of film for the Rhode Island assignment.[126] The argument regarding this letter, however, is but a symptom of a larger disease. The heart of plaintiff's DMCA argument is that NGS "had to know" [127] from the documents in its files that it had no copyright in the relevant works. The problem, however, is that facts are too murky, even after careful study of all of these documents, to justify summary judgment. It therefore follows that NGS cannot be deemed to have known that plaintiff owned them for the simple reason that the evidence is not clear cut.

Plaintiff relies heavily on *Fitzgerald Publishing Co., Inc. v. Baylor Publishing Co., Inc.*,[128] a case interpreting the term "wilfulness" in the context of enhancement of statutory damages for copyright infringement.[129] In the DMCA context, *Fitzgerald* stands, at best, for the proposition that "something less than proof of actual knowledge will suffice to establish knowledge" and that a defendant may be deemed to have "knowledge" that its actions are contrary to law when in possession of documents clearly indicating lack of authorization to take those acts.[130] But that is no answer to the preceding point. Granting *arguendo* that proof of actual knowledge is unnecessary, the fact remains that the evidence is sufficiently ambiguous that it would not permit a reasonable trier of fact to determine that NGS "knew" that plaintiff owned the copyright. Accordingly, defendants are entitled to dismissal of the DMCA claim.

### Conclusion

For the foregoing reasons, defendants' motion for partial summary judgment is

---

**125.** Pl. Mem. Supp. Summary Judgment 20.

**126.** *See id.; see also* Def.App. Ex. G–3 (letter returning film for Rhode Island assignment).

**127.** Pl. Mem. Supp. Summary Judgment 19.

**128.** 807 F.2d 1110 (2d Cir.1986).

**129.** *See id.* at 1114–16.

**130.** *Id.* at 1115. It is important to note the substantial differences between the facts in *Fitzgerald* and the facts here. In *Fitzgerald,* the defendant, World Color Press, originally printed the *Golden Legacy* magazine for the plaintiff, Fitzgerald, from 1974 to 1980. When a dispute broke out regarding the quality of a printing job, World Color Press retained possession of the plates from which *Golden Legacy* was printed. Later, a third party, Bill Baylor, entered into a contract with Fitzgerald, in which Fitzgerald gave Baylor the right to reprint issues of the magazine, but did not transfer copyright. The contract contemplated Baylor paying World Color Press to do the reprinting. Baylor had World Color Press make the reprints, but also had them change the copyright notice from Fitzgerald's name to Baylor's own company's name. *See id.* at 1111–12. At the time Wold Color Press altered the copyright notice, it had circulated two internal memoranda acknowledging that all Baylor had received from Fitzgerald was the right to reprint the magazine. Furthermore, the instructions from Baylor contained no indication that Baylor had obtained greater rights. Finally, World Color Press had a copy of the Fitzgerald–Baylor agreement, which contained no authorization to change the copyright notice. *See id.* at 1115. Defendants here possessed no similarly clear and uncontroverted indications of plaintiff's copyright ownership. Indeed, it is the plaintiff who is hanging by a shoestring on the work-for-hire issue. NGS's supposed admission that it had "no discussion of the DMCA" until suit was filed, *see* Pl. Mem. Law. Supp. Summary Judgment 20, does not change the analysis.

granted to the extent that the copyright infringement claim involving the Cree Indians story and plaintiff's claims under the DMCA are dismissed. Their motion is denied in all other respects. The Court *sua sponte* grants partial summary judgment for plaintiff as to liability with respect to his copyright infringement claim regarding The Living White House.

SO ORDERED.